Hillsborough-southern judicial district
No. 2007-818

IN THE MATTER OF JOHN SALESKY AND JACQUELINE SALESKY

Argued: September 11, 2008
Opinion Issued: October 8, 2008

*Daniel E. Donovan, III*, of Nashua, on the joint brief and orally, for the petitioner.

*Lucinda Hopkins*, of Manchester, by brief and orally, for the respondent.

*Valerie C. Raudonis*, of Nashua, on the joint brief, for the co-guardians.

DALIANIS, J. The respondent, Jacqueline Salesky, appeals the final decree in her divorce from the petitioner, John Salesky, which was recommended by a Marital Master (*Forrest*, M.) and approved by the Superior Court (*Hampsey*, J.). We affirm.

The record supports the following facts. The parties married in 1983, when the petitioner was fifty-five and the respondent was thirty-six. At that

time, the parties were municipal employees living in Manchester. The petitioner retired in 1991. In the spring of 2003, the respondent voluntarily left her last position because she was planning to separate from her husband and move to Florida to be near her daughter.

On August 31, 2003, the petitioner suffered a stroke, which resulted in some loss of speech and memory. In December 2003, the petitioner named the respondent as co-trustee and co-beneficiary of his trust and executed separate durable powers of attorney for healthcare, property and financial matters, which named the respondent as his agent. In preparation for this estate planning, the petitioner was examined by Dr. Phat Nguyen, who opined that he was "competent to make his own decisions in all regards."

Following the petitioner's stroke, the respondent disbursed significant cash assets. For instance, she gave her daughter the entire amount of a $136,000 settlement check that had been made payable to the petitioner and the respondent. She also gave her daughter $38,924 between October 2002 and October 2003, paying most of this sum after the petitioner had his stroke. Also, shortly after the petitioner suffered his stroke, he discovered that $75,000 that had been in a joint account had been depleted to approximately $25,000.

In early October 2004, the petitioner left the respondent to live with his brother and sister-in-law, Edward and Carol Salesky (the Saleskys). Precipitating this separation was an altercation during which the respondent yelled at the petitioner: "John, I don't know what I'm going to do with you, I think I'm going to have to put you in a nursing home."

On October 18, 2004, the petitioner filed an *ex parte* petition seeking a divorce on the ground that irreconcilable differences had caused the irremediable breakdown of the parties' marriage. The respondent objected, seeking to dismiss the petition on the ground that the petitioner was not mentally competent to bring it.

In April 2005, the petitioner was referred for a full psychiatric evaluation based upon his counsel's concern that he was not mentally competent to proceed with the divorce. According to the report of the evaluation, the petitioner demonstrated deficits in a number of areas of neuropsychological functioning, including his ability to understand and recall information he had heard or read, and his ability to remember. The psychiatrist recommended, among other things, that the petitioner "receive assistance when making major decisions regarding his living situation, medical, and legal or fiscal issues in order to protect his interests.

The Saleskys filed a petition for guardianship, which the probate court granted on August 11, 2005. The probate court appointed them as co-guardians over the petitioner's person and estate. The court rejected the respondent's implied request to be appointed guardian, finding that the

parties' "marital status [was] in the thro[e]s of dissolution" and that appointing the respondent as guardian presented "a clear conflict of interest." On October 12, 2005, the superior court denied the respondent's motion to dismiss the petitioner's divorce petition on the ground that it was moot.

In November 2005, the probate court denied the petitioner's motion to remove the co-guardians, but agreed to appoint a guardian ad litem (GAL) to investigate their relationship with the petitioner. In a report filed on January 2, 2006, the GAL reported that the co-guardians were acting in what they perceived to be the petitioner's best interests, that the petitioner was comfortable with their care, and that there was nothing "unusual" in the relationship between the petitioner and the co-guardians. Following its receipt of the report, the probate court denied the respondent's motion for partial reconsideration of its November 2005 order, finding, in part, that her assertion that the co-guardians had exercised undue influence over the petitioner "lacks credible foundation." The probate court denied the respondent's later motion to reconsider this order and for a hearing on undue influence, which the respondent then appealed to this court. While the respondent's appeal of the probate court orders was pending, the divorce action was stayed.

In a November 2006 order, we lifted the stay of the divorce action and affirmed the probate court, holding that it had "sustainably exercised its discretion in denying the 'motion to reconsider and for hearing on undue influence,' and in deciding the motion for partial reconsideration on the basis of offers of proof."

The parties' divorce action was heard over three days in June 2007. On the first day of the hearing, the court granted the petitioner's motion *in limine* to exclude evidence that the co-guardians had exercised undue influence over him. Following the hearing, the court granted the petition for divorce, ruling that the co-guardians had the authority to maintain the divorce action on the petitioner's behalf, and that irreconcilable differences between the parties had caused the irremediable breakdown of their marriage. The respondent moved for reconsideration, which the trial court denied, and this appeal followed.

On appeal, the respondent first argues that the trial court erred when it ruled that the co-guardians had the authority to maintain the divorce action on the petitioner's behalf. In so ruling, the superior court interpreted the probate court's order to confer implied authority upon the co-guardians to maintain the divorce action.

■ The interpretation of a court order is a question of law, which we review *de novo. See Edwards v. RAL Auto. Group*, 156 N.H. 700, 705 (2008).

In construing a court order, we look to the plain meaning of the words used in the document. *Id.* We construe subsidiary clauses so as not to conflict with the primary purpose of the trial court's decree. *Id.* As a general matter, a court decree or judgment is to be construed with reference to the issues it was meant to decide. *Id.*

Here, among the issues the probate court was asked to decide were whether the petitioner had the capacity to exercise the right to marry or divorce and to initiate, defend or settle lawsuits. In its final decree, the probate court specifically found the petitioner incapable of exercising those rights, among others.

Further, in the paragraph that removed those rights from the petitioner, the probate court expressly granted the co-guardians the authority to exercise those rights on his behalf. This paragraph reads: "So far as necessary for, and complementary of, exercise and fulfillment by the co-guardians over the ward's person, powers and authorities conferred, and the duties and obligations imposed upon them, the ward is found incapable of exercising the [following] right[s]." This paragraph directly links the rights removed from the petitioner to the "powers and authorities conferred" and "duties and obligations" imposed upon the co-guardians. Pursuant to this paragraph, the rights removed are those that make it possible for the co-guardians to exercise their duties and obligations— those that are "necessary for, and complementary of" the authority given to the co-guardians. Under this paragraph, therefore, the rights the probate court removed from the petitioner were the very "powers and authorities conferred, and the duties and obligations imposed" upon the co-guardians. To interpret this paragraph otherwise would mean that both the petitioner *and* his guardians lacked the ability to exercise the enumerated rights. Such an interpretation would lead to absurd results.

Further, the letter of appointment addressed to the co-guardians specifically granted them "the authority to exercise all of the rights and powers set forth in RSA 464-A:26, I and II," except for certain rights not at issue in this appeal. Among other powers and duties, RSA 464-A:26, I (2004) specifically requires a guardian to "prosecute or defend actions, claims or proceedings in any jurisdiction for the protection of the estate's assets." Construing all of these documents together, we hold that they expressly conferred upon the co-guardians the authority to maintain the divorce action on the petitioner's behalf.

The respondent contends that notwithstanding the probate court's order, the co-guardians could not prosecute the divorce action because RSA

chapter 464-A (2004 & Supp. 2007) did not grant them this power. In effect, she asserts that the probate court lacked the authority to confer this power upon the co-guardians.

Addressing this contention requires that we interpret the applicable provisions of RSA chapter 464-A. The interpretation of a statute is a question of law, which we review *de novo*. *N.H. Dep't of Envtl. Servs. v. Marino*, 155 N.H. 709, 713 (2007). In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Id*. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id*. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id*.

RSA 464-A:25 (2004) sets forth the general powers and duties of a guardian over the person, and RSA 464-A:26 (2004) sets forth the general powers and duties of a guardian over the estate. Both statutes include a catchall provision, which states, in pertinent part: "The court may limit the powers of the guardian . . . *or impose additional duties* if it deems such action desirable for the best interests of the ward." RSA 464-A:25, II (emphasis added); RSA 464-A:26, V (emphasis added).

■ The plain meaning of the catchall provisions is that the powers and duties set forth in RSA 464-A:25 and RSA 464-A:26 are *not* exclusive, but may be expanded by the probate court when deemed "desirable for the best interests of the ward." *See In re Lanoue*, 147 N.H. 748, 750 (2002). These provisions expressly give the probate court the authority to impose "additional duties." Contrary to the respondent's assertion, therefore, the duties that a probate court may impose upon a guardian are not limited to those specifically enumerated in RSA 464-A:25 and RSA 464-A:26. *Cf. In re Morris*, 111 N.H. 287 (1971) (even though applicable statute at time did not expressly empower probate court to authorize guardian to make gifts from ward's estate to ward's children to avoid certain taxes, court infers such authority from portion of statute that directed guardian to improve ward's estate frugally and without waste). The only limitation upon the probate court's authority to impose additional duties upon a guardian is that the duties be "desirable for the best interests of the ward."

■ Thus, we disagree with the respondent's assertion that the probate court may not expressly grant a guardian the authority to maintain a divorce action on a ward's behalf. Under the catchall provisions, a probate court may expressly grant this authority to a guardian when it deems such action "desirable for the best interests of the ward." Given our finding that the probate court in this case expressly gave the co-guardians the power to

prosecute or defend actions, of which the divorce action is one, we need not decide whether a probate court could impliedly confer this authority upon a guardian. We, therefore, do not address the respondent's assertion that any authority to prosecute a divorce action on a ward's behalf must be expressly given.

The respondent relies upon *Murray by Murray v. Murray*, 426 S.E.2d 781, 784 (S.C. 1993), to support her assertion that absent express statutory authority, a guardian may not prosecute an action on a ward's behalf. *Murray* involved a divorce between an elderly couple. *Murray*, 426 S.E.2d at 782. The parties' son had been appointed conservator and guardian of the husband's estate. *Id.* No conservator or guardian had been appointed for the husband's person as the husband had not yet been adjudicated incompetent in this respect. *Id.* at 784. The son brought the divorce action on the husband's behalf. *Id.* at 782. The wife moved to dismiss, arguing that the son lacked the authority to do so. *Id.*

The appellate court ruled that the divorce action could be pursued if the husband "although mentally incompetent with respect to the management of his estate," was deemed to be "capable of exercising reasonable judgment as to his personal decisions" and was found to be "able to understand the nature of the action and . . . to express unequivocally the desire to dissolve the marriage." *Id.* at 784. On the other hand, if the husband was found to be mentally incompetent both as to his property and his person, then he could not bring a divorce action either on his own behalf or through a guardian. *Id.* The court reasoned that "a divorce action is so strictly personal and volitional that it cannot be maintained at the pleasure of a guardian, even if the result is to render the marriage indissoluble on behalf of the incompetent." *Id.*

*Murray* is distinguishable from the instant case. The statutory scheme at issue in *Murray* did not include a catchall provision similar to RSA 464-A:25, II and RSA 464-A:26, V. *See* S.C. Code Ann. § 62-5-312 (Law. Co-op. 1987). S.C. Code Ann. § 62-5-312, the statute at issue in *Murray*, allows a court to "modify" the duties enumerated therein, but, unlike RSA 464-A:25, II and RSA 464-A:26, V, does not allow a court to impose additional duties upon a guardian. Moreover, unlike the instant case, the guardian initiated the divorce petition in *Murray*, while here the petitioner himself initiated the petition before he was adjudicated incompetent. *Murray*, 426 S.E.2d at 782. Further, while the probate court in this case specifically found the petitioner incapable of exercising his right to divorce and expressly granted this authority to the co-guardians, the court in *Murray* had not yet even adjudicated whether the ward was incapable of exercising his right to divorce. *Id.* at 784.

To the extent that the respondent argues that the legislature could not reasonably have intended to grant probate courts the authority to allow a guardian to maintain a divorce on a ward's behalf as a matter of public policy, we disagree. While it is a "truism that a decision to dissolve a marriage is so personal" that, generally speaking, "a guardian should not be empowered to make such a choice for the incompetent, . . . [u]nless this course of action is available, the competent party is vested with absolute, final control over the marriage. This is not equitable." *In re Marriage of Gannon*, 702 P.2d 465, 467 (Wash. 1985). "Such a situation not only is inequitable, but also threatens to leave an incompetent spouse without adequate legal recourse against potential physical, emotional or financial abuse by the competent spouse." *Ruvalcaba by Stubblefield v. Ruvalcaba*, 850 P.2d 674, 681 (Ariz. Ct. App. 1993). For these reasons, as a policy matter, the legislature reasonably could have vested discretion with the probate court to decide whether it was in the ward's best interests for the guardian to pursue a divorce on the ward's behalf.

These countervailing policy concerns are particularly evident in the instant case, where the probate court found that the respondent had withdrawn substantial funds from the petitioner's bank accounts while acting under a power of attorney and where the co-guardians were merely maintaining a divorce action that the petitioner had brought before he was adjudged incompetent. As the court in *In re Marriage of Burgess*, 725 N.E.2d 1266, 1270 (Ill. 2000), explained: "While the risk that a guardian may be acting contrary to a ward's wishes may support the rule that a guardian's power to initiate a dissolution proceeding must be specified by the legislature, this policy consideration does not justify requiring express statutory authority for a guardian to continue a ward's dissolution proceeding." Where a guardian is maintaining a divorce action that was already begun, "the ward's desire and intention to end the marriage is clear." *In re Marriage of Burgess*, 725 N.E.2d at 1270. The petitioner here filed his divorce petition in October 2004, ten months before he was adjudicated incompetent. In this case, therefore, "the added protection afforded by the rule requiring specific statutory authority for a guardian to represent a ward in a dissolution proceeding is not necessary." *Id.*

The respondent next asserts that the trial court violated her constitutionally protected liberty interest by granting the petitioner's petition for divorce. The respondent has not cited any authority for this proposition, which we reject.

The respondent next contends that the trial court erred when it granted the petitioner's motion *in limine* to exclude evidence that the co-guardians had exercised undue influence over him. As the issue of

whether the co-guardians had exercised undue influence over the petitioner had already been litigated in the probate court, we conclude that the trial court's ruling was not in error. The probate court's decision on this issue had collateral estoppel and/or res judicata effect. *See Cook v. Sullivan,* 149 N.H. 774, 777, 778 (2003).

■ The respondent next argues that the evidence does not support the trial court's finding that the petitioner had the mental capacity to initiate the divorce proceedings. We will affirm the trial court's factual findings unless the evidence does not support them or they are erroneous as a matter of law. *In the Matter of Mannion & Mannion,* 155 N.H. 52, 56 (2007). While the evidence was conflicting on this issue, it was for the trial court, as finder of fact, to resolve these conflicts. *Id.* Because there is evidence in the record to support the trial court's finding that the petitioner had the mental capacity to initiate the divorce, we uphold it. *See id.*

The respondent next asserts that the evidence does not support the trial court's finding that irreconcilable differences caused the irremediable breakdown of the parties' marriage. Whether the irremediable breakdown of the marriage was caused by irreconcilable differences was a factual question for the trial court. *Id.* We will affirm the trial court's finding that irreconcilable differences caused the irremediable breakdown of the parties' marriage unless the evidence does not support it or it is legally erroneous. *Id.*

■ Here, the evidence supports the trial court's findings. A financial advisor with whom the parties consulted shortly after the petitioner's stroke testified that the respondent had talked about previously seeking a divorce. One of the co-guardians testified that the respondent told her that, two or three weeks before the petitioner had his stroke, she was planning to leave him. According to the co-guardian, the respondent told the petitioner: "[Y]ou don't like me and I don't like you. And the only reason I came back [to New Hampshire from Florida] is to get rid of some of my stuff and then I'm going to go live with [my daughter]." The co-guardian also testified that the respondent said that "she wouldn't put it past [the petitioner] to have had a stroke just to keep her from going." She further testified that the respondent said that she was "sick of caring for [the petitioner]." The other co-guardian confirmed that the respondent said that she was "sick and tired" of caring for the petitioner. Additionally, the petitioner's nephew testified that before his stroke, the petitioner told him that he found the respondent "impossible to live with." He testified that, based upon his observations, the parties' marriage was "very stressful, very unloving." He further testified that, before his stroke, the petitioner was considering divorcing the respondent. For his part, the petitioner testified

that he no longer liked or loved the respondent, that he was "positive" that he wanted to divorce her, and that he did not think there were circumstances under which he could get along with her.

■ The trial judge was in the best position to evaluate the evidence, measure its persuasiveness and assess the credibility of witnesses. *In the Matter of Peirano & Larsen*, 155 N.H. 738, 752 (2007). The record supports the trial court's findings, and we find no error in its decision to grant the divorce on the ground that irreconcilable differences caused the irremediable breakdown of the marriage. *See Mannion*, 155 N.H. at 57.

■ The respondent next contends that the trial court's property distribution was unsustainable. "RSA 458:16-a, II creates a presumption that equal distribution of marital property is equitable." *In the Matter of Watterworth & Watterworth*, 149 N.H. 442, 453 (2003) (quotation and ellipsis omitted). Absent special circumstances, the court must make the distribution as equal as possible. *Id.*

■ "The statute enumerates various factors for the court to consider, such as the length of the marriage, the ability of the parties to provide for their own needs, the needs of the custodial parent, the contribution of each party during the marriage and the value of property contributed by each party." *In the Matter of Crowe & Crowe*, 148 N.H. 218, 221 (2002); *see* RSA 458:16-a, II (2004). Additionally, the court may consider "[a]ny other factor [it] deems relevant" in equitably distributing the parties' assets. RSA 458:16-a, II(o). A trial court is not precluded, however, from awarding a particular asset in its entirety to one party. *See Letendre*, 149 N.H. at 36.

■ We afford trial courts broad discretion in determining matters of property distribution in fashioning a final divorce decree, and we will not overturn the trial court's decision absent an unsustainable exercise of discretion. *In the Matter of Hampers & Hampers*, 154 N.H. 275, 285 (2006). If the court's findings can reasonably be made on the evidence presented, they will stand. *Id.*

The trial court's narrative order indicates that the court found it equitable to divide the equity in the marital home equally and to divide the remaining assets approximately equally. To the extent that the division was unequal, the trial court found that the inequality was in the respondent's favor as she received her annuity (valued at $30,000), her vehicle (valued at $7,500), the majority of the household furniture and appliances, and her pension (valued at $60,000). The petitioner, on the other hand, received his annuity (valued at $41,000), cash (valued at $3,300) and his pension (the value of which the court had no information).

The respondent argues that the trial court erred because it did not address the parties' respective needs when deciding how best to distribute their assets. We are unable to address this argument substantively because the record submitted by the respondent is insufficient.

 As the appealing party, the respondent had the burden of providing this court with a record sufficient to decide her appeal issues. *See Rix v. Kinderworks Corp.*, 136 N.H. 548, 553 (1992); *see also* SUP. CT. R. 13. Although the trial court's narrative order indicates that the trial court ruled upon 110 requests for findings of fact and rulings of law submitted by the respondent, she has not provided this court with these requests. Absent the requests for findings and rulings, we must assume that the trial court made all findings necessary to support its decision, *see In re Jonathan T.*, 148 N.H. 296, 304 (2002), and that, contrary to the respondent's assertions, it did consider the parties' respective needs when dividing their property.

 The respondent further contends that the trial court erred by considering the fact that she "gifted significant marital assets to her family members following the petitioner's stroke." As the applicable statute grants the trial court the authority to consider "[t]he actions of either party during the marriage which contributed to the . . . diminution in value of property owned by either or both . . . parties," RSA 458:16-a, II(f), as well as "[a]ny other factor [it] deems relevant" in equitably distributing the parties' assets, RSA 458:16-a, II(o), we hold that to consider this fact was not error.

To the extent that the respondent argues that the trial court's findings in its decree are somehow inconsistent, we do not share her interpretation of the decree. We decline to address the respondent's final assertion that the court erred in "not addressing disposal of the ward's marital distribution," because this argument is not sufficiently developed to warrant appellate review. *See ACG Credit Co. v. Gill*, 152 N.H. 260, 264 (2005).

*Affirmed.*

BRODERICK, C.J., and DUGGAN and GALWAY, JJ., concurred.