NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Department of Health and Human Services
No. 2015-0748

PETITION OF WAYNE SAWYER
(New Hampshire Department of Health and Human Services)

Argued: September 14, 2016
Opinion Issued: June 30, 2017

Disability Rights Center-NH, Inc., of Concord (Aaron Ginsberg on the brief and orally), for the petitioner.

Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief and orally), for the respondent.

BASSETT, J. The petitioner, Wayne Sawyer, has a developmental disability and a history of mental illness. He currently receives state-administered developmental and mental health services and lives at the Laconia Designated Receiving Facility (Laconia DRF), a state-operated facility in Laconia. Prior to his move to Laconia DRF, the petitioner requested that his area agency affiliation for developmental services be changed to the respondent, Lakes Region Community Services (LRCS), the area agency serving Laconia. LRCS denied his request. The petitioner appealed to the Administrative Appeals Unit (AAU) of the New Hampshire Department of Health and Human Services (DHHS). The AAU affirmed, finding that the petitioner failed to prove that his move to Laconia DRF constituted a change in legal residence.

The petitioner challenges the AAU decision and has petitioned for a writ of certiorari.  See Sup. Ct. R. 11.  We reverse.

### I.  Overview of Developmental and Mental Health Services Systems

We begin with an overview of the two statutory frameworks under which the petitioner receives developmental and mental health services.  DHHS is responsible for establishing, maintaining, and coordinating a "comprehensive service delivery system for developmentally disabled persons," known as the developmental services system, RSA 171-A:1 Introductory Language (2014), and a "comprehensive, effective and efficient system of services for persons with mental illness," known as the mental health services system, RSA 135-C:1, I (2015).  Although DHHS coordinates both systems statewide, each is governed by distinct statutory and regulatory schemes.

### A.  Developmental Services

DHHS administers the developmental services system pursuant to RSA chapter 171-A.  RSA 171-A:4 (2014).  The policy underlying the developmental services system is that persons with developmental disabilities and their families be provided with services "that emphasize community living," RSA 171-A:1 Introductory Language, that are "based on individual choice," RSA 171-A:1, V (2014), and that allow them an opportunity to participate in decision-making, RSA 171-A:1, I (2014).  An individual's participation in the developmental services system may be voluntary or involuntary.  See RSA 171-A:5 (2014).  Participation is voluntary unless the individual is involuntarily admitted pursuant to RSA chapter 171-B (2014).  RSA 171-A:5, I-II.  Persons voluntarily participating in the system have certain statutory and regulatory rights, see RSA 171-A:14 (2014), and may, at any time, "seek a change in services or withdraw entirely from the service delivery system," RSA 171-A:7 (2014); see also N.H. Admin. R., He-M 310.

To receive voluntary developmental services, an individual must apply through the area agency serving his or her region.  See RSA 171-A:6, I (2014); N.H. Admin. R., He-M 503.04(b).  The state is divided into ten regions, with one area agency serving each region.  N.H. Admin. R., He-M 505.04.  Area agencies are the primary recipients of funds dispensed by DHHS for use in administering developmental services and programs, and as such, serve as the nucleus of services for individuals living in each service region.  See RSA 171-A:18, I (2014); N.H. Admin. R., He-M 505.03(a)-(b).  Individuals can change their area agency affiliation to an area agency in a different region if they "plan[] to relocate where [they] live[]" to that region.  N.H. Admin. R., He-M 503.14(a).  Area agencies are responsible for, among other things, screening for eligibility, identifying appropriate services, and developing and reviewing service agreements.  See RSA 171-A:6, II (2014); RSA 171-A:18, I; N.H. Admin. R., He-M 505.03.  In addition to the basic developmental services provided by

regional area agencies, individuals may also receive developmental services through a variety of other programs or institutions.  See, e.g., N.H. Admin. R., He-M 507 (community participation services), He-M 524 (in-home services), He-M 1001 (community residences).

### B.  Mental Health Services

DHHS administers the mental health services system pursuant to RSA chapter 135-C.  See RSA 135-C:5, I (2015).  The purpose of the mental health services system is to provide mentally disabled individuals "adequate and humane care which, to the extent possible," is "[w]ithin each person's own community," "[l]east restrictive of the person's freedom of movement and ability to function normally in society while being appropriate to the person's individual capacity," and "[d]irected toward eliminating the need for services and promoting the person's independence."  RSA 135-C:1, II (2015).  Individuals may receive mental health services on a voluntary or involuntary basis.  See RSA 135-C:12, I-II (2015); RSA 135-C:20-:54 (2015 & Supp. 2016).  Both classes of admittees have certain statutory and regulatory rights.  See RSA 135-C:55-:60 (2015); N.H. Admin. R., He-M 309, 311.

The mental health services system is also organized regionally, with one designated community mental health program serving each of ten regions.  See N.H. Admin. R., He-M 425.03(a)-(b).  Community mental health programs are tasked with providing, either directly or through a contractual relationship, an array of services to eligible individuals, including intake assessments, case management, medication services, and psychotherapy.  RSA 135-C:7 (2015); N.H. Admin. R., He-M 403.06(a).  Though mental health services are organized by regional community mental health programs, other facilities, including the New Hampshire Hospital, also deliver mental health services.  See, e.g., RSA 135-C:26, I (2015); N.H. Admin. R., He-M 1002 (community residences).

### II.  Factual Background

The record supports the following facts.  The petitioner is an individual with a developmental disability who is eligible to receive developmental services pursuant to RSA chapter 171-A.  Prior to 2008, he lived in Concord and received his area agency developmental services through Community Bridges — the area agency serving Concord.

In 2008, after completing a criminal sentence, the petitioner was involuntarily admitted to the mental health services system pursuant to RSA chapter 135-C.  He was housed in the Secure Psychiatric Unit (SPU) of the New Hampshire State Prison in Concord during this admission period.  In 2009, he entered into a stipulation with the Office of the Attorney General to continue to be subject to involuntary admission.  Specifically, the parties stipulated that the petitioner "presents a potentially serious likelihood of significant danger to

3

himself or to others if he is not involuntarily admitted to the SPU for a period of five years, with the possibility of transfer to a less restrictive inpatient facility, and/or conditional discharge as soon as appropriate." The parties further agreed that the petitioner was eligible for developmental services under RSA chapter 171-A and that the Bureau of Developmental Services "shall continue to make best efforts to arrange an appropriate placement for him outside of the [New Hampshire Hospital] and [the] SPU, including coordination with non-State agencies as applicable." Nonetheless, the petitioner remained at the SPU until 2014.

In January 2014, the SPU administrator petitioned to renew the petitioner's involuntary admission under RSA chapter 135-C. The probate court granted this request, extending his involuntary admission for a period not to exceed five years "with a conditional discharge and/or transfer to [Laconia DRF], or other appropriate residential facility that provides the security, staffing, and treatment requirements necessitated by [the petitioner's] mental condition when an appropriate bed is available." Laconia DRF is located within LRCS's service region.

In October 2014, after learning that Laconia DRF soon would have a bed available for him, the petitioner sent a letter to Community Bridges and LRCS notifying them that he would be moving to Laconia to "begin a placement at the Laconia DRF soon" and, consequently, that he "wishe[d] to transfer his area agency services" from Community Bridges to LRCS. LRCS denied this request, stating that "this is clearly a placement and does not meet the criteria for transfer of [a]rea [a]gency services." LRCS further explained that "[s]ince [the petitioner] does not have a discharge plan and/or date, a transfer to LRCS is premature at this time." The petitioner appealed to the AAU.

In April 2015, while his appeal was pending, the petitioner moved to Laconia DRF. Upon moving to Laconia DRF, the petitioner began to receive residential developmental services from Laconia DRF and mental health services from the community mental health program serving Laconia's region. These services are distinct from the area agency developmental services that are the focus of this dispute. At some point between October 2014, when the petitioner requested a change in area agency affiliation, and September 2015, the petitioner stopped receiving area agency services from Concord's Community Bridges and began receiving case management services from the Brain Injury Association. The Brain Injury Association was not a designated area agency during that time period.

Subsequently, the AAU affirmed LRCS's decision to deny area agency services. It characterized the petitioner's move to Laconia DRF as an "institutional transfer" or "legal placement," not a conditional discharge or "voluntary relocation." (Quotations omitted.) Consequently, it concluded that the petitioner's move did not constitute a change in legal residence to Laconia,

4

and, therefore, he had no right to change his area agency affiliation to LRCS. The AAU denied the petitioner's motion to reconsider. This petition followed.

On appeal, the petitioner argues that, under RSA chapter 171-A and its implementing regulations, he had a right to change his area agency affiliation to LRCS. Specifically, he argues that the AAU erred by deeming his move to Laconia DRF to be a transfer rather than a conditional discharge, and therefore, concluding that he did not voluntarily move to Laconia DRF. He also argues that, even if he was involuntarily transferred to Laconia DRF, the AAU erred by denying him his constitutional right to choose his place of residence.

LRCS counters that, because the petitioner remains institutionalized and was not conditionally discharged, his move was involuntary and, therefore, he has no right to change area agency affiliation. It contends that, under our case law regarding other institutionalized persons such as delinquent children and prisoners, the responsibility and cost of providing services is borne by the community in which the person resided prior to being institutionalized. LRCS argues, therefore, that Concord's Community Bridges, not it, should bear the responsibility and cost of providing services to the petitioner. LRCS also argues that "[a]llowing people in [the petitioner's] situation to change" area agency affiliations would impose "additional burdens" on the developmental services system.

### III. Standard of Review

"The only judicial review of a fair hearings decision issued by the department is by petition for a writ of certiorari." Petition of Kalar, 162 N.H. 314, 318 (2011) (quotations and brackets omitted). "Review on certiorari is an extraordinary remedy, usually available only in the absence of a right to appeal, and only at the discretion of the court." Petition of Chase Home for Children, 155 N.H. 528, 532 (2007). Our review of an AAU decision on a petition for writ of certiorari entails examination of whether the AAU "acted illegally with respect to jurisdiction, authority or observance of the law or has unsustainably exercised its discretion or acted arbitrarily, unreasonably or capriciously." Id. "We exercise our power to grant such writs sparingly and only where to do otherwise would result in substantial injustice." Id.

### IV. Analysis

The parties dispute one overarching issue — whether the petitioner had a right to change his area agency affiliation to LRCS. The petitioner argues that, pursuant to RSA chapter 171-A and New Hampshire Administrative Rule He-M 503.14 (He-M 503.14), he had a right to change his area agency affiliation. LRCS argues, as a threshold matter, that He-M 503.14 does not apply to the petitioner. First, it argues that, because the petitioner remains involuntarily admitted under the mental health services system and his discharge from that

5

admission is not imminent, the petitioner lacks any meaningful choice concerning where he lives, and his request to change area agency affiliation is premature. Second, LRCS argues that, because he has no control over where he lives, he should be treated like other institutionalized persons — such as prisoners and delinquent children. Relying upon statutes and case law governing those persons, LRCS argues that, because the petitioner resided in Concord prior to his institutionalization, he should remain affiliated with Community Bridges, and therefore cannot change his developmental services area agency affiliation to LRCS.

The assumption underlying LRCS's arguments is that the petitioner's admission status in the <u>mental health services</u> system controls his right to seek changes in his <u>developmental services</u>. We disagree. We conclude that, regardless of whether the petitioner remains involuntarily admitted under the mental health services system, he retains the separate right to seek changes in his developmental services.

To reach this conclusion we must interpret the statutory and regulatory schemes governing the mental health and developmental services systems. We review the interpretation of statutes and regulations <u>de</u> <u>novo</u>. <u>Bach v. N.H. Dep't of Safety</u>, 169 N.H. 87, 91 (2016). "We use the same principles of construction when interpreting both statutes and administrative rules." <u>Id</u>. at 92. When interpreting statutes, "[w]e are the final arbiters of the legislature's intent, as expressed in the words of the statute considered as a whole." <u>N.H. Assoc. of Counties v. Comm'r, N.H. Dep't of Health & Human Servs.</u>, 156 N.H. 10, 15 (2007). "We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used." <u>Id</u>. "When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include." <u>Id</u>. "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." <u>Id</u>.

We first address LRCS's threshold arguments that He-M 503.14 does not apply to the petitioner. As illustrated by our statutory overview, the legislature has established comprehensive — and independent — statutory schemes governing developmental and mental health services. LRCS's arguments conflate these two schemes. Even if we assume that the petitioner remains subject to an involuntary admission under RSA chapter 135-C (Mental Health Services) and that he was transferred, not conditionally discharged, to Laconia DRF pursuant to that statutory scheme, the petitioner retains <u>separate</u> rights under RSA chapter 171-A to receive and to seek changes in his developmental services.

6

One of the primary policy goals of the developmental services system "emphasize[s] community living," RSA 171-A:1 Introductory Language, and "full participation [of individuals] in the community, sharing ordinary places, [and] developing meaningful relationships," RSA 171-A:1, III (2014). The legislature also expressed an intent that the system provide "[s]ervices based on individual choice," RSA 171-A:1, V, and encourage "[p]articipation of people with developmental disabilities and their families in decisions concerning necessary, desirable, and appropriate services, recognizing that they are best able to determine their own needs," RSA 171-A:1, I. To that end, RSA chapter 171-A provides individuals the right to, at any time, "seek a change in services or withdraw entirely from the service delivery system." RSA 171-A:7; see also N.H. Admin. R., He-M 310.

RSA 171-A:7 specifically extends this right to individuals receiving developmental services on a voluntary basis, but not to those individuals who have been involuntarily admitted under RSA chapter 171-B. RSA 171-A:7. Had the legislature also intended to exclude individuals involuntarily admitted under RSA chapter 135-C, it could have done so. See Grafton County Attorney's Office v. Canner, 169 N.H. 319, 327 (2016) (observing that if legislature intended to prohibit public access to prosecution and arrest records, it could have employed the language used elsewhere in same statute to keep other categories of records nonpublic); N.H. Assoc. of Counties, 156 N.H. at 15 (stating that, in statutory interpretation, we will not "add language that the legislature did not see fit to include"). Accordingly, the petitioner's admission status in the mental health services system is irrelevant to his right to receive and seek changes in his developmental services.

The AAU found that the petitioner's receipt of developmental services is voluntary, and there is no evidence in the record to suggest that the petitioner is, or ever was, involuntarily admitted under RSA chapter 171-B. Accordingly, he retains the right to "seek a change in [developmental] services or withdraw entirely from the [developmental] service delivery system." RSA 171-A:7. Here, he seeks to change his area agency affiliation based upon his move to Laconia. We conclude that his entitlement to seek such change is governed by He-M 503.14. Regardless of the petitioner's status in the mental health services system, he receives developmental services voluntarily and, therefore, has the right to seek a change in his developmental services under He-M 503.14. In other words, we reject LRCS's argument that He-M 503.14 does not apply to the petitioner.

Nor are we persuaded by LRCS's argument that we should look to statutes and case law governing other institutionalized persons, rather than to He-M 503.14, to determine whether the petitioner may seek a change in his area agency affiliation within the developmental services system. As discussed above, there is a comprehensive statutory scheme governing developmental services, see RSA ch. 171-A (2014 & Supp. 2016), and there is a specific

regulation that governs the petitioner's request to change his area agency affiliation, see N.H. Admin. R., He-M 503.14. By contrast, LRCS relies upon authorities that are inapposite: they relate to different classes of people, see RSA 654:2-a, I (2016) (defining domicile of prisoners for voting purposes), or were decided under different statutory schemes, see, e.g., In re Gary B., 124 N.H. 28, 31-33 (1983) (interpreting meaning of "resided" under statute governing allocation of special education expenses). Accordingly, we see no reason to rely upon other statutory schemes to determine whether, under RSA chapter 171-A and its implementing regulations, the petitioner has a right to seek a change in his area agency affiliation.

Turning to the interpretation of He-M 503.14, we first note that the AAU relied upon a prior version of this regulation — previously numbered as He-M 503.15 (2007) (amended 2015) — in concluding that LRCS properly refused the petitioner's request to change his area agency affiliation. The AAU interpreted the prior version of the regulation as requiring the petitioner to show that his move to Laconia DRF constituted a change in his place of residence. However, on appeal, LRCS does not rely upon the same prior version of the regulation as did the AAU. Rather, LRCS agrees that, if the regulation applies to the petitioner, the amended version — He-M 503.14 —controls. He-M 503.14 provides:

> (a) If an individual, guardian, or representative plans to relocate where the individual lives and wishes to transfer the individual's area agency affiliation to that region, the individual, guardian, or representative shall notify, in writing, the area agency in the current region and the area agency in the proposed region that the individual is moving and wishes to transfer services to that region.

N.H. Admin. R., He-M 503.14(a).

To the extent that LRCS argues that the language of He-M 503.14(a) requires that, in order to have the right to change area agency affiliation, the petitioner's move must be voluntary, we assume, without deciding, that this interpretation is correct. The petitioner asserts that, by agreeing to a conditional discharge within the mental health services system, he made a voluntary choice to move to LRCS's service region. LRCS counters that the petitioner's move to Laconia DRF was not voluntary because, as the AAU concluded, the petitioner was not conditionally discharged to Laconia DRF, but involuntarily transferred there. Even assuming that, under He-M 503.14, in order for an individual to change his area agency affiliation, the move must be voluntary, we agree with the petitioner that he satisfied that requirement.

The material facts are not in dispute. The facts and circumstances relied upon by the AAU demonstrate that the petitioner moved to Laconia DRF pursuant to a conditional discharge. This conclusion is supported by the April

2014 probate court order, the agreement regarding the petitioner's conditional discharge, and the statutes governing conditional discharges.

First, the April 2014 probate court order contemplated that the petitioner would be conditionally discharged to Laconia DRF. In the order, the court repeatedly cited RSA 135-C:45, II and III — which authorize the court to identify an individual as eligible for conditional discharge or renewal of an existing conditional discharge. See RSA 135-C:45, II-III (Supp. 2016). Notwithstanding the fact that the court included the terms "transfer" and "conditional transfer," we interpret the order as allowing for the petitioner's conditional discharge to a less restrictive placement, such as Laconia DRF, as soon as possible. See In the Matter of Salesky & Salesky, 157 N.H. 698, 702 (2008) (interpretation of a court order presents a question of law, which we review de novo).

Second, the conditional discharge contemplated by the probate court order became operative only upon the petitioner's execution of the "AGREEMENT REGARDING CONDITIONAL DISCHARGE" (agreement) (bolding omitted). The language of the agreement tracked the requirements imposed by the statutes and regulations governing conditional discharge. See generally RSA 135-C:50-:51 (2015); N.H. Admin. R., He-M 609. The agreement included the petitioner's signature, evidencing his consent, see RSA 135-C:50, I; it outlined the conditions the petitioner must abide by, see id.; and it set forth a procedure that would apply regarding revocation of his conditional discharge, see N.H. Admin. R., He-M 609.06-.07. Thus, we interpret the agreement as effectuating the petitioner's conditional discharge to Laconia DRF. See Gen. Linen Servs. v. Franconia Inv. Assocs., 150 N.H. 595, 597 (2004) (interpretation of an agreement presents a question of law, which we review de novo).

Third, the circumstances of the petitioner's move to Laconia DRF bear all of the hallmarks of a conditional discharge within the mental health services system. See RSA 135-C:2, V (2015) (defining conditional discharge); RSA 135-C:50 (establishing conditions under which conditional discharge is authorized). The petitioner consented to the terms of his conditional discharge, see RSA 135-C:50, I (requiring person's informed consent), he was released from a mental health receiving facility — the SPU, see RSA 135-C:2, XIV (2015) (defining "[r]eceiving facility"), and he now accepts mental health treatment on an out-patient basis from a community mental health program, see RSA 135-C:50, III (requiring participation in out-patient treatment at community mental health program during conditional discharge term).

The fact that the petitioner has not been released into the community at large and instead is subject to the restrictive living conditions at Laconia DRF is not inconsistent with our conclusion. The applicable statutes and regulations do not define conditional discharge as a release into the community

9

with no restrictions. See RSA 135-C:2, V, :50, I, III; N.H. Admin. R., He-M 609.03. Indeed, here, the restrictive conditions of Laconia DRF do not vitiate the fact of the conditional discharge but, rather, are important terms of the petitioner's conditional discharge. See RSA 135-C:50, I (requiring imposition of conditions for conditional discharge).

It follows, from our conclusion that the petitioner was conditionally discharged, that he voluntarily moved to LRCS's service region. A conditional discharge, by definition, involves a voluntary decision. See RSA 135-C:50, I (requiring "informed decision" to obtain a conditional discharge); RSA 135-C:2, IX (2015) (defining "[i]nformed decision" as a choice made "voluntarily after all relevant information necessary to making the decision has been provided" (emphasis added)). The fact that the petitioner was limited to two options — move to Laconia DRF subject to the terms of the agreement, or remain at the SPU — did not make his choice any less voluntary. All conditional discharges are subject to limitations, see RSA 135-C:50, I; N.H. Admin. R., He-M 309.06(a)(11), yet they nonetheless involve the individual's informed, voluntary choice, see RSA 135-C:2, IX. Therefore, we conclude that, given that the petitioner was conditionally discharged, he voluntarily moved to the LRCS service region. Consequently, we further conclude that, pursuant to He-M 503.14, the petitioner had the right to change his area agency affiliation to, and receive services from, LRCS.

Finally, LRCS argues that "[a]llowing people in [the petitioner's] situation" to change area agency affiliation would impose "additional burdens" upon communities with facilities like Laconia DRF and upon the developmental services system as a whole. However, aside from certain routine "administrative events," it is not entirely clear from LRCS's argument what these "additional burdens" might be. The legislature, not the locality or the area agency, is responsible for appropriating funding for developmental services. See RSA 171-A:1-a, II (2014); RSA 171-A:18, I-II (2014). Indeed, as acknowledged by LRCS in its brief, the funding for area agency developmental services — including funding allocated for administrative costs — is transferred from the current area agency to the new area agency when an individual changes area agency regions. N.H. Admin. R., He-M 503.14(c). We also observe that the stated purpose of RSA chapter 171-A is provision of developmental services with an emphasis on individual choice, see RSA 171-A:1, V, and community living, see RSA 171-A:1 Introductory Language, not an equal distribution of the responsibility and cost of providing services among area agencies. Thus, the specific allocation of responsibilities and costs among area agencies is the product of the structure and purpose of the statutory scheme itself; any argument that this approach is misguided, costly, or inefficient should be made not to this court but, rather, to the legislature. Ultimately, LRCS raises this "additional burdens" argument in the wrong forum. Dolbeare v. City of Laconia, 168 N.H. 52, 57 (2015) ("[M]atters of public policy are reserved for the legislature.").

10

Because we agree with the petitioner that he had a right to change his area agency affiliation to LRCS under He-M 503.14, we need not reach his constitutional claim.  See Bach, 169 N.H. at 91, 94.

Reversed.

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred; LYNN, J., dissented.

LYNN, J., dissenting.  In my view, there are two problems with the majority's decision to grant certiorari relief to the petitioner.  First, I disagree with the majority's conclusion that New Hampshire Administrative Rule He-M 503.14(a) granted him the right to have the area agency with which he is affiliated for the provision of developmental services changed to Lakes Region Community Services (LRCS) when he moved from the Secure Psychiatric Unit (SPU) to the Laconia Designated Receiving Facility (Laconia DRF).

The regulation states:

(a)  If an individual, guardian, or representative plans to relocate where the individual lives and wishes to transfer the individual's area agency affiliation to that region, the individual, guardian, or representative shall notify, in writing, the area agency in the current region and the area agency in the proposed region that the individual is moving and wishes to transfer services to that region.

(b)  The current area agency shall send to the proposed area agency all information regarding the individual, including information concerning funding for the individual's services.

(c)  The current area agency shall transfer to the proposed area agency all funds being spent for the individual's services, including funds allocated for administrative costs, with the exception of regional family support state funds.

(d)  Service coordinators shall coordinate individual transfers so that benefits obtained from third party resources such as Medicaid and the division of vocational rehabilitation shall not be lost or delayed during the transition from one region to another.

N.H. Admin. R., He-M 503.14.  This regulation seems to me to be merely a housekeeping rule that recognizes that the area agency which provides services to a developmentally disabled person generally will change when the person relocates to another region of the state.  It establishes a procedure for providing notice of the relocation, transferring information and funding, etc., in order to

11

effectuate the transfer of services to the area agency that covers the location to which the recipient has moved.

Although the regulation is drafted in terms which envision that such requests will be granted (as I presume they usually are), nothing in the text of the regulation reflects an intent to bestow upon service recipients a judicially enforceable "right" to have the services provided by any particular area agency. In particular, I find nothing in the text of the regulation that can reasonably be construed to confer an entitlement to a transfer in circumstances, such as exist here, in which there has been no showing that the failure to effectuate the transfer of services has adversely affected in any way the person receiving the services. At most, the regulation, when considered in conjunction with RSA chapter 171-A's various references to "community living," may be read to reflect a purpose to ensure that services be provided to a developmentally disabled person in the community <u>where</u> he or she lives, rather than by any particular service agency.

This brings me to the second and more fundamental problem with the decision of the majority. The petitioner has neither alleged nor proved that he has suffered the type of concrete injury that would give us subject matter jurisdiction to adjudicate this dispute. <u>See</u> <u>Petition of Lath</u>, ___ N.H. ___, ___, 154 A.3d 1240, 1244 (2017) ("[A] person seeking to challenge an agency's action through a petition for a writ of certiorari must show that his personal rights have been or will be 'impaired or prejudiced' by the agency's decision."); <u>see</u> <u>also</u> <u>Birch Broad. v. Capitol Broad. Corp.</u>, 161 N.H. 192, 199 (2010) ("The requirement that a party demonstrate harm to maintain a legal challenge rests upon the constitutional principle that judicial power ordinarily does not include the power to issue advisory opinions."). Although no party challenges the petitioner's standing, because standing is a necessary prerequisite to our exercise of subject matter jurisdiction, it may be raised by the court <u>sua sponte</u>. <u>See</u> <u>Duncan v. State</u>, 166 N.H. 630, 639-40 (2014). The majority essentially assumes that the petitioner was harmed, but he does not claim that he is not getting the services that he should be getting under RSA chapter 171-A. After Community Bridges in Concord stopped providing him services, the Brain Injury Association of New Hampshire began providing the services to him. Thus, he is receiving all of the services to which he is entitled.

If, for example, the petitioner had alleged that the Brain Injury Association was providing him inferior or incomplete services compared to the services that LRCS would provide, or that the services were not being provided to him <u>in Laconia</u> where he now resides, or that he was being delayed or inconvenienced by the Brain Injury Association providing those services, he would have standing, and his case would be properly before us. However, the Administrative Appeals Unit (AAU) of the New Hampshire Department of Health and Human Services found that the appellant was "currently receiving independent case management services through the Brain Injury [Association]

12

as arranged by the Bureau of Developmental Services."  Consequently, the AAU found that the petitioner was "being afforded all the necessary coordination of services referred to in He-M 503 while he is confined to the [Laconia] DRF" and therefore was "suffering no harm" from LRCS's decision to defer accepting him. In his motion to reconsider, the petitioner did not argue that this finding was erroneous.  Nor did he argue in his appellate brief, or at oral argument, that he is not receiving the services to which he is entitled.

Therefore, because the petitioner has not alleged actual harm and has not challenged the AAU's finding that he has suffered no harm, he lacks standing, and this case should be dismissed.

For the reasons stated above, I respectfully dissent.

13