# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2024-0213, <u>State of New Hampshire v. Shane M. Beattie & a.</u>, the court on June 18, 2025, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal and has determined to resolve this case by way of this order. <u>See Sup. Ct. R.</u> 20(3). The defendants, Shane and Trina Beattie, appeal an order of the Superior Court (<u>MacLeod</u>, J.) granting summary judgment to the State on its declaration of the taking of the defendants' property. We affirm.

We described the factual and procedural history of this case in <u>State v. Beattie</u>, 173 N.H. 716 (2020), and thus need not repeat it here. There, we reversed the trial court's order granting the State's motion to dismiss because we concluded that the <u>de novo</u> standard of review applies to the trial court's review of preliminary objections that challenge necessity, public uses, or net-public benefit in eminent domain matters that involve condemnation of land for the alteration of a state highway. <u>See Beattie</u>, 173 N.H. at 722; <u>see also</u> RSA 498-A:1, 9-b (2010). The project to alter US Route 2 and build a new bridge replacing the Rogers' Rangers Bridge in Lancaster that spanned the Connecticut River (the Project) moved forward and a new bridge has been built. The facts pertinent to this appeal are taken from the trial court's order or are otherwise supported by the record.

On remand, the State renewed its motion to dismiss and the defendants objected, arguing that the Project would cause "substantial damages to their land by altering long-established flood patterns in the Connecticut River, causing more flooding to come closer to their property than usual; and that the [P]roject will cause flooding to areas adjacent to their property." In December 2021, the trial court granted the State's motion as to the issue of necessity, a ruling that the defendants have not appealed, but denied the motion as to the issue of whether the taking would result in a net-public benefit. Thus, the sole claim that remained was the defendants' assertion that the State's taking of their property lacked a net-public benefit.

In May 2022, the State moved for summary judgment, arguing that the undisputed material facts demonstrated that there was a net-public benefit to the taking. The defendants objected, asserting that the State performed an improper net-public benefit balancing test when it failed to avail itself of the Federal Emergency Management Agency's (FEMA) conditional letter of map

revision (CLOMR) process.[1]  More specifically, the defendants alleged that the State's process was flawed because it was driven by the State's pre-determined goal of avoiding FEMA's CLOMR process.  They also argued that the Project was not built according to the original proposed plans because it elevated, instead of lowered, Route 2 near their home, which adversely affected the State's conclusions and promises it made as to the Project's impact on the defendants' property.  According to the defendants, this argument presented a genuine dispute of material fact "as to whether or not the Project was undertaken in the manner in which it was proposed and whether or not the [defendants'] property will be adversely affected by what was actually constructed."

Following a hearing on the State's motion, the trial court issued an order granting summary judgment for the State on January 15, 2024.  The order noted that the New Hampshire Department of Transportation (DOT) contracted with Hoyle, Tanner & Associates (Hoyle Tanner), an engineering consulting firm, to conduct, among other things, two hydraulic analyses to evaluate and determine the Project's effect on the Connecticut River's flow regimes and water surface elevations.  Hoyle Tanner's conclusions were described in two reports, which were submitted in the summary judgment record, documenting a computer modeling analysis that was completed in August 2017 and a two-dimensional hydraulic computer modeling analysis that was completed in August 2018.  Based upon the 2018 analysis, Hoyle Tanner's project manager concluded that there would be "no significant change in Connecticut River flow regimes or increase in water surface elevations . . . despite relocation of US Route 2 to the north of the [the defendants' property] and the increased driveway profile grade at its intersection with US Route 2."

The trial court also noted that in his affidavit defendant Shane Beattie asserted that "the Hydraulic Analysis performed by [Hoyle Tanner] amounted to pretext, in that it was designed with an end-result in mind . . . allow[ing] DOT to make good on its decision that it did not want to involve 'the feds' as part of this Project."  In his affidavit, Beattie also claimed that a DOT official commented to him that the DOT did not want "the feds" involved when Beattie requested that the DOT prepare and file a CLOMR.  The defendants also filed another affidavit from the Lancaster town manager stating that he observed a DOT representative telling Beattie that the DOT "was not going to file a CLOMR."

---

[1] As the trial court explained, "A CLOMR is 'FEMA's comment on a proposed project that would, upon construction, affect the hydrologic or hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway.'" (Quoting 44 C.F.R. § 72.2). According to the defendants "'A CLOMR is a pre-project application to FEMA showing what changes the proposed project will make to the local floodplain.'" (Quoting Hall v. City of Bryant, 379 S.W.3d 727, 729, n. 4 (Ark. Ct. App. 2010)).

However, the court observed that the defendants did not challenge the Hoyle Tanner analyses as not performed in accordance with standard engineering practices, and it found the information submitted in the defendants' affidavits constituted "general allegations" which did not "'set forth specific facts showing that there is a genuine issue for trial.'" (Quoting Beckles v. Madden, 160 N.H. 118, 122 (2010)). The court found persuasive the deposition testimony of Hoyle Tanner's project manager "that there were no discussions between himself and the DOT, nor amongst Hoyle Tanner employees, that the models must reflect that there would be no increase in flood elevation levels in order for the State to avoid the CLOMR process." The court concluded that, prior to the construction of the Project, the State fulfilled its regulatory obligations by "'demonstrat[ing] through hydrologic and hydraulic analyses . . . that the proposed encroachment would not result in any increase in flood levels within the community'" (quoting 44 C.F.R. § 60.3(d)(3); therefore, the State was not required to seek FEMA's review through the CLOMR process and the defendants' claim to the contrary did not create a genuine issue of material fact.

Next, the trial court rejected the defendants' claim that the State's balancing test was flawed because the State assumed that the Project would be constructed according to the original proposed plan, as opposed to the "as built" plans. Although the defendants' expert engineering consultant, the H.L. Turner Group (Turner Group), conducted a preliminary investigation indicating that the defendants "will likely see a slightly higher flood level and longer duration of flooding as a result of the new Route 2 bridge and roadway approach," the court noted that the Turner Group's analysis was incomplete and a final report had not been submitted for the court's consideration. In addition, the court observed that the Turner Group's lead civil engineer did not offer an affidavit attesting to the final results of the Turner Group's analysis. Accordingly, the court concluded that this opinion "was based on incomplete data and was not supported by specific facts to support a genuine issue of material fact to survive a motion for summary judgment" and granted summary judgment to the State. The defendants moved for reconsideration, which the trial court denied. This appeal followed.

On appeal, the defendants argue that the trial court erred in granting summary judgment to the State by: (1) improperly discounting the weight of the defendants' expert opinion challenging the Hoyle Tanner analyses; (2) rejecting the defendants' evidence that the State improperly avoided the CLOMR process without an evidentiary hearing; and (3) failing to consider certain allegedly uncontested facts introduced by the defendants that presented genuine issues of material fact for trial. The State responds by maintaining that the Project and taking were appropriate and constituted a net-public benefit and that the trial court properly determined that the defendants did not adequately dispute the State's material facts. The State also argues that the trial court properly determined that the defendants failed

to present sufficient facts supporting their allegation that the DOT improperly avoided its federal obligations and contends that the State successfully challenged the relevant facts asserted by the defendants in replying to their objection to summary judgment.

When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. Camire v. Gunstock Area Comm'n, 166 N.H. 374, 376 (2014). We will affirm the trial court's summary judgment decision if there are no genuine issues of material fact, and if the moving party is entitled to judgment as a matter of law. Id. "A fact is material if it affects the outcome of the litigation under the applicable substantive law." Franciosa v. Hidden Pond Farm, Inc., 171 N.H. 350, 354 (2018). We review the trial court's application of the law to its factual findings de novo. Id.

In the context of a condemnation matter, the condemning authority must apply the net-public benefit balancing test. "To determine whether a proposed condemnation is a public necessity, the taking authority must consider whether there is a public purpose for the taking and whether the taking will result in public benefit." Petition of Bianco, 143 N.H. 83, 86 (1998). Public benefit is measured by considering "the benefits of the proposed project and the benefits of the eradication of any harmful characteristics of the property in its present form, reduced by the social costs of the loss of the property in its present form." Id. (quotation omitted).

We begin by addressing the defendants' argument that the trial court erred by discounting the weight of their expert's opinion which challenged the Hoyle Tanner analyses. More specifically, the defendants maintain that "the trial court erred as it weighed the content of the [defendants'] opposing Affidavits as opposed to conducting an analysis to determine whether the opposing Affidavits revealed 'reasonable and specific grounds for believing that evidence disputing the moving party's affidavits can be produced at trial.'" Omiya v. Castor, 130 N.H. 234, 237 (1987). The State counters that the trial court's order "did not weigh expert opinions; rather, the trial court held that the [defendants'] expert did not present sufficient evidence to demonstrate a genuine issue of fact for trial." We agree with the State. See In the Matter of Salesky & Salesky, 157 N.H. 698, 702 (2008) (interpretation of a trial court order is a question of law, which we review de novo).

When opposing summary judgment, the non-moving "party's response must do more than . . . dispute the facts set forth in the moving party's affidavit. It must set forth specific facts showing the existence of a genuine issue for trial. Mere denials or vague and general allegations of expected proof are not enough." Omiya, 130 N.H. at 237 (citation omitted). Here, the trial court found that the Turner Group's expert opinion was based upon "incomplete data and was not supported by specific facts to support a genuine

4

issue of material fact to survive a motion for summary judgment." We agree with the trial court.

At the outset, the Turner Group's report, which was submitted to the defendants on May 12, 2022, represented that its purpose was "to provide . . . the results of our initial preliminary investigation on the impact from flooding on the [defendants'] property as a result of [the Project]." Based upon its "preliminary investigation," the Turner Group found that the defendants' property "will likely see a slightly higher flood level and longer duration of flooding as a result of [the Project]." (Emphasis added.) However, the report also provides that a two-dimensional river model "needs to be finished to complete the flood impact analysis," and when the results of that analysis are available, studies of "the flood level rise and duration of flooding impacts . . . [can] be performed . . . . [and] a final report of this investigation can be completed." Our review of the record supports the State's assertion that the Turner Group's report "does nothing more than guess that the [defendants'] property will see increased flooding," and does not assert an affirmative finding or opinion regarding "how the flooding would change, how much it would increase, [or] for how much longer the property would flood."

Based upon this record, we cannot conclude that the trial court erred by finding that the defendants' expert opinion "was based on incomplete data and was not supported by specific facts to support a genuine issue of material fact to survive a motion for summary judgment." Cf. Omiya, 130 N.H. at 236-39 (explaining that summary judgment was improper where the plaintiff filed an affidavit asserting specific contradictory facts from discoverable documents that provided "reasonable evidence that a genuine issue of material fact" existed as to the defendant's negligent operation of his vehicle). The Turner Group's preliminary assumptions needed to be tested and confirmed by additional two-dimensional modeling. Accordingly, the report failed to set forth specific facts that created a genuine issue of material fact as to whether the State improperly applied the balancing test to determine the net-public benefit of the Project because these assumptions were not sufficiently specific to cast doubt on the State's calculation of the social costs of the loss of the property in its present form. See Petition of Bianco, 143 N.H. at 86.

Next, we address the defendants' argument that the trial court erred by rejecting the defendants' evidence, including Beattie's affidavit, suggesting DOT improperly avoided the FEMA CLOMR process, without convening an evidentiary hearing. The defendants also presented an affidavit from the Lancaster town manager stating that he recalled overhearing "a DOT representative stating to Mr. Beattie that DOT 'was not going to file a CLOMR' with FEMA in connection with the [Project]." In their brief, the defendants assert that "[t]he Court's summary judgment decision improperly discounted the testimony from Mr. Beattie and [the Turner Group] that the [P]roject would likely result in a flood elevation change which all parties agreed would require

[DOT to comply with] the CLOMR process." They further contend that their assertion that DOT designed the Project "with an end result in mind to avoid a CLOMR statement presents an issue of opinion that should not have been resolved without hearing from the witnesses directly."

However, we agree with the trial court that the information submitted by the defendants that DOT allegedly sought to avoid the CLOMR process constitutes "general allegations of expected proof" that failed to "set forth specific facts showing that there is a genuine issue for trial." (Quotation omitted). Contrary to the defendants' assertion, the trial court did not make a determination about the credibility of their witnesses, but rather concluded that the statements asserted in their affidavits were not specific facts that established a genuine issue for trial.

Moreover, as the trial court observed, the defendants did not challenge Hoyle Tanner's analyses as not being performed in accordance with standard engineering practices or standards. Consequently, the trial court properly accepted Hoyle Tanner's tested conclusions, rather than the Turner Group's preliminary assumptions, in finding that: "[t]he State demonstrated through hydrologic and hydraulic analyses performed in accordance with standard engineering practice that the [P]roject would not result in any increase in flood levels within the community . . . [thereby] properly fulfilling its [federal] regulatory requirements." (Quotations omitted.) Accordingly, we conclude that the trial court did not err in finding that the defendants' assertion that DOT designed and analyzed the Project as a pretext to avoid FEMA regulations was insufficient to defeat summary judgment.

Finally, we briefly address the defendants' argument that the trial court was barred from granting summary judgment because the State failed to contest many of the facts introduced by the defendants in opposing summary judgment. The record indicates that the defendants' response to the State's summary judgment "Statement of Material Facts" alleged additional material facts beyond those alleged by the State.[2] Many of the 13 facts asserted were addressed, refuted or placed into context by the State's evidence as discussed above. In addition, a number of the facts alleged discrepancies between the proposed Project plans and the "as built" plans.

When conducting the appropriate balancing test to determine public necessity, "the taking authority must consider all public benefits of the proposed taking against all burdens and social costs suffered by every affected property owner." Petition of Bianco, 143 N.H. at 87. When the condemnation decision was made, however, the commission appointed by the Governor and

---

[2] Whether this process complies with Superior Court Rule 12(g)(3)(c) and (d) is immaterial, because the record does not include an objection and the State did not specifically respond to the defendants' statement of additional material facts.

6

the Executive Council to determine whether there was an occasion to construct the Project did not have the benefit of the "as built" plans, and neither did the State. As the trial court observed: "'As built' plans would not have been appropriate for the State to consider in the preliminary objection proceeding" simply because they did not exist at that time.

We agree with the trial court that its <u>de novo</u> review of the net-public benefit analysis is limited to evidence that was available at the time that the condemnation decision was initially made and that could have been considered by the commission. As the State explains in its brief, should the as-built Project affect the value of the defendants' property, by virtue of increased flooding or other "flooding impacts," that evidence may be relevant only to the determination of either just compensation for the taking or in a future action for inverse condemnation. However, that evidence is not relevant to the net-public benefit analysis at issue here. We conclude that the record supports the trial court's finding that the State's net-public benefit analysis appropriately considered all of the public benefits of the proposed taking against all social costs suffered by every affected property owner with the information that the State had when the condemnation decision was made. <u>See</u> <u>Appeal of City of Keene</u>, 141 N.H. 797, 802-03 (1997). Accordingly, we affirm the trial court's order.

<u>Affirmed</u>.

DONOVAN, and COUNTWAY, JJ., concurred; ABRAMSON, J., retired superior court justice, specially assigned under RSA 490:3, II, concurred.

**Timothy A. Gudas,**
**Clerk**

7