# Supreme Court of Texas

No. 23-0463

In the Matter of the Marriage of Carlos Y. Benavides, Jr. and Leticia R. Benavides

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

**Argued September 10, 2024**

JUSTICE BOYD delivered the opinion of the Court.

CHIEF JUSTICE BLACKLOCK filed a concurring opinion, in which Justice Devine and Justice Sullivan joined.

A woman appointed as guardian for her elderly father moved him out of the house he shared with his fourth wife and later filed for divorce on his behalf on the ground that the couple had lived apart for more than three years. The trial court granted the divorce, and the wife appealed. The man died while the appeal was pending, and the court of appeals dismissed the appeal as moot and affirmed the divorce decree. The wife raises three issues in this Court, arguing (1) the man's death did not moot her appeal, (2) Texas law does not permit a guardian to sue for divorce on her ward's behalf, and (3) living apart is not a ground for divorce when neither spouse voluntarily lived apart from the other.

We agree that the man's death did not moot the appeal because whether the marriage ended by divorce or by death substantially affects the wife's asserted property interests. We need not definitively decide the second issue and need not reach the third. To whatever extent the Texas Estates Code may allow a guardian to seek a divorce on her ward's behalf, it at least requires the guardianship and divorce courts to find that permitting the divorce would promote the ward's well-being and protect his best interests. Because neither court made that finding in this case and—because of the ward's death—neither can do so now, we reverse the court of appeals' judgment, vacate the divorce decree, and dismiss.

## I.
## Background

Carlos "C.Y." Benavides, Jr. was the patriarch of "one of Laredo's oldest and most powerful clans."[1] A descendant of Laredo's founder, Carlos[2] had substantial assets, including as a beneficiary of the Benavides Family Mineral Trust.[3] Carlos married his fourth wife, Leticia Russo, on September 11, 2004. They each signed a pre-marital agreement and a post-marital agreement in which they stipulated that no community property would ever be created during the marriage and

---

[1] Christopher Hooks, *Trash Talk*, TEXAS MONTHLY (October 2016), https://www.texasmonthly.com/articles/battle-over-laredo-landfill.

[2] Because many of the people involved in this case share the same surname, we will refer to them by their first names.

[3] *See Benavides v. Alexander*, 646 S.W.3d 14, 18 (Tex. App.—San Antonio 2021, pet. denied); *Benavides v. Mathis*, 433 S.W.3d 59, 62 (Tex. App.—San Antonio 2014, pet. denied).

2

that each spouse's separate property and any income it produced would belong solely to that spouse, or to his or her estate, unless one transferred the property to the other "by will or other written instrument."[4]

About seven months after Carlos and Leticia married, Carlos filed for divorce (the First Divorce Proceeding). About five months later (a year after they married, and while the divorce proceeding was pending), a physician diagnosed Carlos with dementia. *See Alexander*, 646 S.W.3d at 18. Carlos did not pursue the divorce, and the trial court dismissed the First Divorce Proceeding for want of prosecution in February 2007. Leticia asserts that Carlos changed his mind about wanting a divorce. Carlos's adult daughter from a prior marriage—Linda Cristina Benavides Alexander—contends that Carlos wanted the divorce but was unable to pursue it because of his quickly worsening dementia.

By the end of 2007, Carlos had signed documents adding Leticia's name to his bank accounts, designating the accounts as joint accounts with a right of survivorship, conveying an office building to Leticia, and identifying both spouses as borrowers on a loan to refinance their residence. *Id*. Leticia asserts that Carlos gave her "full authority" over his accounts and repeatedly told her that "todo lo mio es tuyo"—"all that I have is yours." *Id*. Linda contends that, to the extent Carlos in fact did

---

[4] *See In re Marriage of Benavides*, 692 S.W.3d 526, 533–34 (Tex. App.—San Antonio 2023) (further describing details of the pre-marital agreement). Although Leticia has disputed that she signed or even knew about the pre-marital agreement until several years after the wedding, she concedes that she signed the post-marital agreement and thus ratified the pre-marital agreement. *See Alexander*, 646 S.W.3d at 18.

or said any of these things, he did so only because Leticia took advantage of his mental incapacity. The ensuing disputes between Linda and Leticia have led to numerous lawsuits and appeals, which we will refer to as the Guardianship Proceeding, the Trust-Distribution Proceeding, the Interpleader Proceeding, the Second Divorce Proceeding, the Third Divorce Proceeding, and the Will-Contest Proceeding.[5]

---

[5] *See, e.g.*, *In re Marriage of Benavides*, 692 S.W.3d at 545 (dismissing Leticia's appeal from divorce decree entered in Third Divorce Proceeding as moot because Carlos died while appeal was pending and affirming divorce decree); *In re Marriage of Benavides*, No. 04-24-00006-CV, 2024 WL 1893651, at *1 (Tex. App.—San Antonio May 1, 2024, no pet.) (mem. op.) (dismissing for want of jurisdiction Leticia's appeal from order in Third Divorce Proceeding denying her motion to modify temporary orders pending her appeal from divorce decree); *In re Est. of Benavides*, No. 04-21-00077-CV (Tex. App.—San Antonio Aug. 7, 2023, order) (denying motion to lift abatement of appeal from judgment in Will-Contest Proceeding), available at https://tinyurl.com/ytkawkma; *In re Guardianship of Benavides*, No. 04-20-00598-CV (Tex. App.—San Antonio Dec. 14, 2021, order) (abating appeal from judgment in Guardianship Proceeding), available at https://tinyurl.com/4teed3pt; *Alexander*, 646 S.W.3d at 14 (reversing and affirming in part final judgment in Interpleader Proceeding, upholding rulings that Carlos, through his guardian, was entitled to possession and control of all disputed funds and property but striking finding regarding Carlos's mental capacity at time of alleged oral gift of residence); *In re Benavides*, No. 04-21-00008-CV, 2021 WL 260253, at *1 (Tex. App.—San Antonio Jan. 27, 2021, orig. proceeding) (mem. op.) (denying Leticia's petition for writ of injunction and prohibition arising out of Will-Contest Proceeding because Leticia "has not shown the issuance of a writ of injunction or prohibition is necessary to enforce our jurisdiction"); *In re Guardianship of Benavides*, No. 04-19-00801-CV, 2020 WL 7365454, at *5 (Tex. App.—San Antonio Dec. 16, 2020, no pet.) (mem. op.) (reversing orders in Guardianship Proceeding dismissing Leticia's objections to Linda's request for distribution instructions and motion to remove Linda as guardian); *In re Benavides*, 605 S.W.3d 234, 239 (Tex. App.—San Antonio 2020, pet. denied) (dismissing Leticia's appeal and denying her mandamus petition challenging order in Guardianship Proceeding striking her motion to vacate the part of 2013 order that declared the 2011 will and related estate-plan documents void); *In re Benavides*, No. 04-

On September 2, 2011, Linda and her brothers filed an application for appointment of a guardian over Carlos's person and

14-00718-CV, 2014 WL 6979438, at *4 (Tex. App.—San Antonio Dec. 10, 2014, orig. proceeding) (mem. op.) (granting mandamus to compel the court hearing the Second Divorce Proceeding to grant Leticia's plea in abatement to allow the court hearing the Interpleader Action to resolve all issues over rights to marital property); *Benavides v. Benavides*, No. 04-14-00523-CV, 2014 WL 5020283, at *2 (Tex. App.—San Antonio Oct. 8, 2014, pet. denied) (mem. op.) (affirming summary judgment for Benavides Family Mineral Trust's co-trustees on Leticia's fiduciary-duty claims); *In re Guardianship of Benavides*, No. 04-13-00196-CV, 2014 WL 1494606, at *4 (Tex. App.—San Antonio Apr. 16, 2014, no pet.) (mem. op.) (reversing order in Guardianship Proceeding granting attorney ad litem's motion to compel production of attorney's client file and granting sanctions); *In re Guardianship of Benavides*, No. 04-13-00197-CV, 2014 WL 667525, at *2 (Tex. App.—San Antonio Feb. 19, 2014, pet. denied) (mem. op.) (dismissing Leticia's appeal from order in Guardianship Proceeding holding Leticia lacks standing to contest guardianship or appointment guardian because she asserted interests adverse to Carlos by suing to challenge the pre- and post-marital agreements and claiming Carlos's property as community property); *Mathis*, 433 S.W.3d at 67 (affirming summary judgment in Interpleader Proceeding holding trust distributions are Carlos's separate property); *Benavides v. Mathis*, No. 04-13-00186-CV, 2013 WL 5950123, at *1 (Tex. App.—San Antonio Nov. 6, 2013, no pet.) (mem. op.) (granting motion to dismiss Leticia's appeal from summary-judgment order in Interpleader Proceeding because order was not final and appealable); *In re Benavides*, No. 04-13-00280-CV, 2013 WL 2145997, at *1 (Tex. App.—San Antonio May 15, 2013, orig. proceeding) (mem. op.) (denying Carlos's mandamus petition challenging order on motion to compel in Guardianship Proceeding on ground that attorney lacked authority to file on Carlos's behalf); *In re Benavides*, No. 04-13-00012-CV, 2013 WL 1460468, at *1 (Tex. App.—San Antonio Apr. 10, 2013, orig. proceeding) (mem. op.) (denying Leticia's mandamus petition arising out of Second Divorce Proceeding, without explanation); *In re Guardianship of Benavides*, 403 S.W.3d. 370, 377 (Tex. App.—San Antonio 2013, pet. denied) (affirming guardianship court's order holding attorney lacked authority to represent Carlos in Guardianship Proceeding); *In re Benavides*, No. 04-11-00755-CV, 2011 WL 5115868, at *1 (Tex. App.—San Antonio Oct. 26, 2011, orig. proceeding) (denying without discussion Leticia and Carlos's mandamus petition and emergency-relief motion arising out of Guardianship Proceeding).

estate (the Guardianship Proceeding). *See Guardianship of Benavides*, 403 S.W.3d at 373. About two weeks later, Carlos signed a new will and related documents (the 2011 Will) that named Leticia as his executor, left his entire estate to Leticia, expressly disqualified his children from serving as his guardian, named Leticia as his preferred guardian, and granted Leticia his financial and medical powers of attorney. *Id.* at 375. Leticia and Carlos filed these documents in the Guardianship Proceeding, objected to the appointment of a guardian, and moved to dismiss Linda's application. On October 14, 2011, the guardianship court appointed Shirley Hale Mathis as temporary guardian of Carlos's person and estate and appointed an attorney ad litem to represent Carlos's interests.[6]

Acting as Carlos's temporary guardian, Mathis notified the co-trustees of the Benavides Family Mineral Trust of her appointment and requested that they send Carlos's trust distributions to her. *Mathis*, 433 S.W.3d at 62. She also notified certain banks that she had the exclusive right to access Carlos's accounts. Leticia objected to both actions and instructed the co-trustees and banks that she was entitled to all or half of the distributions and accounts. When the co-trustees refused to honor her demands, Leticia sued Mathis for tortious interference and the trustees for breach of fiduciary duties (the

---

[6] *See generally Mathis*, 433 S.W.3d at 62; *Guardianship of Benavides*, 2014 WL 1494606, at *1; *Guardianship of Benavides*, 403 S.W.3d. at 373. The Texas Estates Code authorizes courts to appoint a temporary guardian if substantial evidence demonstrates that the proposed ward may be incapacitated and that the immediate appointment of a guardian is required. TEX. EST. CODE § 1251.001(a); *see In re Guardianship of Fairley*, 650 S.W.3d 372, 376 (Tex. 2022).

6

Trust-Distribution Proceeding). *Id.* at 62, 61 n.1.[7] Around the same time, the banks filed an interpleader action to resolve Leticia's and Mathis's competing claims to Carlos's bank accounts (the Interpleader Proceeding). *Benavides*, 2014 WL 6979438, at *1. Leticia filed crossclaims in the Interpleader Proceeding against Mathis and Linda, who in turn asserted counterclaims against Leticia. *Id.* Leticia claimed in this proceeding that Carlos had orally gifted all his property to her.[8]

Meanwhile, in the Guardianship Proceeding, Linda objected to Leticia and Carlos's appearance and to their filing of the 2011 Will, asserting that Leticia lacked standing to appear because she had asserted interests adverse to Carlos and that Carlos lacked capacity to sign the documents or to hire an attorney in 2011. On May 21, 2012, the guardianship court agreed and found that Carlos was totally incapacitated in 2011 and was thus incompetent to determine his own residence, to make decisions regarding his marriage, to sign the 2011 Will, or to hire the attorney who appeared on his behalf in the Guardianship Proceeding. The court also dismissed Leticia from the suit, ruling that she lacked standing to contest the guardianship or the

---

[7] The trial court hearing the Trust-Distribution Proceeding ultimately granted summary judgment for Mathis and the trustees on all claims, *Mathis*, 2013 WL 5950123, at *1, and the court of appeals affirmed, holding that the trust distributions were Carlos's separate property. *Mathis*, 433 S.W.3d at 67; *see also Benavides*, 2014 WL 5020283, at *2. We denied Leticia's petition for review.

[8] After a jury trial in the spring of 2018, the court of appeals ultimately rejected Leticia's claims in the Interpleader Proceeding and ruled that Carlos, acting through the guardian of his estate, was entitled to possession and control of the funds and property as his sole and separate property. *Benavides*, 646 S.W.3d at 22–26. We again denied Leticia's petition for review.

appointment of a guardian because she had asserted interests adverse to Carlos's interests in the Trust-Distribution Proceeding and the Interpleader Proceeding.[9]

On October 12, 2012, Mathis, as temporary guardian of Carlos's person and estate, filed for divorce on Carlos's behalf (the Second Divorce Proceeding). Leticia filed a plea in abatement in July 2013, arguing that the court hearing the Interpleader Proceeding had dominant jurisdiction over the claims involving the marital property and concurrent jurisdiction over the divorce claim. The divorce court denied Leticia's plea, but the court of appeals granted Leticia's mandamus petition, holding that the Interpleader Proceeding court had dominant jurisdiction because that case was filed first, involved all the parties to the divorce proceeding, and "either includes or could be amended to include all of the issues to be determined in the divorce." *Id.* at *1–2. In 2017, Mathis nonsuited her claims in the Second Divorce Proceeding.

Meanwhile, on March 6, 2013, the guardianship court appointed Mathis as the permanent guardian of Carlos's estate and appointed

---

[9] Carlos's attorney filed a notice of appeal, but the court of appeals affirmed, rejecting the argument that Carlos was entitled to a jury trial on the issue of whether he lacked capacity to hire the attorney who appeared on his behalf. *Guardianship of Benavides*, 403 S.W.3d. at 375. Leticia also appealed, but the court of appeals dismissed her appeal, agreeing that she lacked standing to contest the guardianship or the appointment of a guardian because of her interests adverse to Carlos. *Guardianship of Benavides*, 2014 WL 667525, at *1.

Linda as the permanent guardian of his person.[10] This order explicitly granted Mathis the power to "file, prosecute or defend any litigation, *including divorce proceedings* on [Carlos's] behalf" (emphasis added). *Mathis*, 433 S.W.3d at 62 & n.2. Later that month, the court granted *Linda* the power "to prosecute, defend and otherwise participate in [the] divorce action." Neither order expressly found, however, that the divorce proceeding would be in Carlos's best interests or promote his well-being. A few weeks later, with the guardianship court's approval, Linda moved Carlos from the home he shared with Leticia into a house on Linda's property.

On October 19, 2016, Mathis resigned as guardian of Carlos's estate and the guardianship court appointed Linda as permanent guardian of his person and estate.[11] In March 2018, after Mathis had nonsuited the Second Divorce Proceeding, Linda filed the Third Divorce Proceeding, which is the proceeding that gives rise to this present appeal. Leticia filed a plea to the jurisdiction, arguing that Linda lacked

---

[10] The Estates Code authorizes guardianships of a person, an estate, or both. *See* TEX. EST. CODE §§ 1002.012(b), 1101.001(b)(3); *see also Guardianship of Fairley*, 650 S.W.3d at 380–81.

[11] Mathis resigned amid allegations that she had a less-than-impartial relationship with the trial judge, who himself resigned from the bench and surrendered his law license in part because of complaints waged against him in the Guardianship Proceeding. *See* César Rodriguez & Taryn Walters, *Judge Jesus 'Chuy' Garza arrested*, LAREDO MORNING TIMES (Jan. 13, 2017), https://www.lmtonline.com/news/article/Judge-Jesus-Chuy-Garza-arrested-10855115.php; COMM'N ON JUD. CONDUCT, *In re Honorable Jesus "Chuy" Garza* (Jan. 25, 2017), https://www.scjc.texas.gov/media/46412/GarzaResignation.pdf. Following these events, Leticia moved to vacate the original judge's orders, but the new judge denied the motion, and Leticia did not appeal that ruling.

9

standing to file for divorce and that she had conflicts of interest that disqualified her from serving as Carlos's guardian. The trial court denied Leticia's plea.

In August 2020, Linda filed partial-summary-judgment motions to enforce the pre-marital and post-marital agreements, to confirm the status of Carlos's separate property, and to obtain a final judgment of divorce. As grounds for the divorce, she asserted that Carlos and Leticia had lived apart without cohabitation for more than three years. *See* TEX. FAM. CODE § 6.006 ("The court may grant a divorce in favor of either spouse if the spouses have lived apart without cohabitation for at least three years."). The trial court granted Linda's motions, rendering divorce and holding that the pre-marital and post-marital agreements are valid, that no community property was created by the marriage, and that Carlos's separate property was not subject to division in the divorce. The court then denied or overruled all of Leticia's motions for reconsideration and for new trial, as well as her objections to the final divorce decree. Leticia appealed from the divorce decree, but Carlos died two weeks later. *See* 692 S.W.3d at 531.

On December 24, 2020, the day after Carlos died, Linda filed an application to probate a will Carlos signed in 1996, which left all his assets to Linda and her brothers (the Will-Contest Proceeding). Leticia then filed a competing application to probate the 2011 Will, which left everything to Leticia. Both parties contested the other party's proposed will. The trial court rendered judgment for Linda, and Leticia appealed.

The court of appeals has abated Leticia's appeals from the judgments in the Will-Contest Proceeding and the Guardianship

10

Proceeding, pending resolution of this appeal from the judgment in the Third Divorce Proceeding.[12] In this appeal, Linda moved to dismiss on the ground that Carlos's death rendered the appeal moot. The court of appeals agreed and dismissed the appeal, but it nevertheless affirmed the divorce decree. *Id.* at 545. We granted Leticia's petition for review.

## II.
## Mootness

We begin with the jurisdictional issue of whether Carlos's death on December 23, 2020, mooted Leticia's appeal from the divorce decree rendered in the Third Divorce Proceeding on September 9, 2020. We conclude it did not.

Under Texas law, a marriage "may be terminated only by death or a court decree." *Claveria's Est. v. Claveria*, 615 S.W.2d 164, 167 (Tex. 1981). Because a divorce decree is purely personal to the parties, a suit for divorce becomes moot if a spouse dies *before* the court renders judgment granting the divorce. *Whatley v. Bacon*, 649 S.W.2d 297, 299 (Tex. 1983) (orig. proceeding). When that occurs, the marriage necessarily ends by death, rather than by decree. *See Baker v. Bizzle*, 687 S.W.3d 285, 289 & n.3 (Tex. 2024) (citing cases).[13]

---

[12] *See Est. of Benavides*, No. 04-21-00077-CV (Aug. 7, 2023, order), available at https://tinyurl.com/ytkawkma (abating appeal from judgment in the Will-Contest Proceeding); *Guardianship of Benavides*, No. 04-20-00598-CV (Dec. 14, 2021, order), available at https://tinyurl.com/4teed3pt (abating appeal from judgment in Guardianship Proceeding).

[13] *See also Baker*, 687 S.W.3d at 296 (LEHRMANN, J., concurring) ("When a party to a divorce proceeding dies before the trial court has [rendered judgment of divorce], the unsurprising result is dismissal on mootness grounds.").

But when a spouse dies *after* a trial court has rendered a valid divorce decree, the marriage ends by decree rather than by death. Yet this is true only if the divorce decree is valid, and an appeal may be required to resolve a party's challenge to its validity. In some cases, the decree's validity is legally irrelevant because how the marriage ended does not affect either party's rights. But in other cases, "the property rights of the parties would be significantly affected depending upon whether the marriage was held to have been terminated by divorce decree or by death." *Dunn v. Dunn*, 439 S.W.2d 830, 834 (Tex. 1969).[14] When the way the marriage ended significantly affects a spouse's property rights, a live controversy remains between the parties and the parties retain the opportunity to challenge the decree's validity on

---

[14] Justice Lehrmann recently provided examples of ways in which the termination of a marriage by divorce prior to one spouse's death "can have a significant effect on distribution of [the deceased spouse's] estate":

> For example, if a person gets divorced after making a will, then the will's provisions are read as if the former spouse had failed to survive her, unless the will expressly provides otherwise. TEX. EST. CODE § 123.001(b)(1). A divorce also revokes provisions in certain trust instruments executed by the deceased person before the divorce. *Id.* § 123.052. Intestacy laws apply differently depending on whether the deceased person left a surviving spouse. *Id.* § 201.001–.003. Nontestamentary assets are likewise affected; the Family Code places conditions on the validity of a provision in a life insurance policy issued before a divorce naming the former spouse as a beneficiary. TEX. FAM. CODE § 9.301.

*Baker*, 687 S.W.3d at 296–97 (LEHRMANN, J., concurring); *see Novotny v. Novotny*, 665 S.W.2d 171, 174 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd) (holding death did not moot appeal when divorce affected party's right to receive employment and insurance benefits).

appeal. *Id.*[15] In that circumstance, the spouse's death does not moot the appeal. *Id.*

Leticia contends that Carlos's death did not moot her appeal challenging the divorce decree's validity because the decree significantly affects her rights under Carlos's 2011 Will.[16] Leticia concedes that Texas law prevents her from receiving any assets under the 2011 Will if the divorce decree is valid, even though the will names her as Carlos's sole beneficiary.[17] But if the divorce decree is invalid, Leticia is Carlos's

---

[15] *See, e.g.*, *Guardianship of Fairley*, 650 S.W.3d at 380 (holding party's post-judgment death did not moot appeal because "live controversy" remained over which court should properly adjudicate a wrongful-death claim); *Zipp v. Wuemling*, 218 S.W.3d 71, 73 (Tex. 2007) ("An appeal is moot when a court's action on the merits cannot affect the rights of the parties." (quoting *VE Corp. v. Ernst & Young*, 860 S.W.2d 83, 84 (Tex. 1993))).

[16] Leticia argued in her briefing that the distinction also affects property rights other than her rights under the 2011 Will, but she conceded at oral argument that she now relies only on the latter. *See* Supreme Court of Texas, *23-0463 Matter of the Marriage of Carlos and Leticia Benavides*, YouTube (Sept. 10, 2024), https://www.youtube.com/watch?v=HMSEbo9tbZk, at 8:00–8:52 ("[Justice Boyd:] So what property right would be significantly affected if . . . it's determined that she takes through the divorce as opposed to the death? [Leticia:] The will. . . . [Justice Boyd:] So do you concede that she waived the . . . constitutional life estate in the marital home? . . . [Leticia:] That's not at issue. . . . Really, what it boils down to is the will."). Similarly, Linda argued in her briefing that Leticia's appeal is moot but conceded at oral argument that it is not. *See id.* at 25:32–25:58 ("[Linda:] If the test is whether the outcome would be different today whether they were married on death or divorced on death, clearly the outcome would be different because she would at least have the opportunity to present her will. . . . [Justice Boyd:] And then that says to me under *Dunn*, it's not moot. [Linda:] I think you're right. Under *Dunn*, it's not moot.").

[17] *See* TEX. EST. CODE § 123.001(b)(1) ("If, after the testator makes a will, the testator's marriage is dissolved by divorce, . . . [then] unless the will expressly provides otherwise[,] . . . all provisions in the will . . . shall be read as if the former spouse . . . had failed to survive the testator.").

13

surviving spouse and has standing to pursue her claim to Carlos's assets under the 2011 Will. In response, Linda argues that whether the marriage ended by death or divorce is irrelevant because Leticia can never receive anything under the 2011 Will. In support, Linda asserts that courts have already concluded that the will itself is invalid because Carlos was incapacitated when he signed it.

Based on our review of all the various proceedings, however, it appears that no court has yet issued a final, non-appealable judgment that both declares the 2011 Will invalid and binds Leticia. As explained above, Leticia appeared in the Will-Contest Proceeding and offered the 2011 Will for probate, but Linda argued that Leticia lacked standing to participate in that proceeding because the divorce court rendered the divorce decree before Carlos died. In response, Leticia asked the probate court to abate the Will-Contest Proceeding until the courts resolve this appeal from the divorce decree. The trial court refused to abate and instead dismissed Leticia's claims for lack of standing. Leticia appealed that order, arguing that the trial court abused its discretion by denying her motion to abate the Will-Contest Proceeding.[18] Leticia then filed a motion in the court of appeals to abate that appeal.[19] The court of appeals granted the motion on December 15, 2021, and Leticia's appeal has been pending in that court since, awaiting resolution of this appeal

---

[18] *See* Appellant's Brief*, Est. of Benavides*, No. 04-21-00077-CV, available at https://tinyurl.com/322y7dy9.

[19] *See* Appellant's Opposed Motion to Abate, *Est. of Benavides*, No. 04-21-00077-CV, available at  https://tinyurl.com/yc6spmrc.

14

from the divorce decree.[20] In short, the Will-Contest Proceeding has not been finally decided and remains abated until after a final decision is rendered in this divorce action.

Nevertheless, Linda argues that courts in other proceedings have already issued judgments that declare the 2011 Will invalid because Carlos lacked capacity when he signed it. Linda points first to orders entered in the Guardianship Proceeding in 2013, seven years before any will contest began. As explained above, Leticia appeared in the Guardianship Proceeding and relied on the 2011 Will and related documents to challenge Linda's guardianship application. The probate court ultimately dismissed Leticia from the suit, concluding she lacked standing to contest the creation of a guardianship or the appointment of a guardian because she asserted interests adverse to Carlos in the Trust-Distribution Proceeding and the Interpleader Proceeding. The court also found that Carlos lacked capacity in September 2011, declared the 2011 Will and related documents void, and granted Linda's application for appointment of a guardian.

Leticia appealed those orders, but Linda challenged Leticia's standing "to appeal from any order except the one finding that she had

---

[20] *See Est. of Benavides*, No. 04-21-00077-CV (Dec. 15, 2021, order), available at https://tinyurl.com/4afvsk9j. On July 18, 2023, after the court of appeals issued its decision in this case dismissing Leticia's appeal from the divorce decree and affirming the divorce, Linda moved to lift the abatement in the Will-Contest Proceeding. *See* Appellee's Motion to Lift Stay, *Est. of Benavides*, No. 04-21-00077-CV, available at https://tinyurl.com/hzpbzfyx. The court of appeals denied the motion on August 7, 2023, noting that Leticia had filed a petition for review in this Court challenging the divorce decree. *See Est. of Benavides*, No. 04-21-00077-CV, (Aug. 7, 2023, order), available at https://tinyurl.com/2krbcrjx.

no standing to contest the guardianship."[21] The court of appeals agreed and affirmed the dismissal of Leticia's claims. *Guardianship of Benavides*, 2014 WL 667525, at *1. Linda contends that the court affirmed the orders voiding the 2011 Will, but the court of appeals' opinion does not support that characterization. The court affirmed only "the probate court's order that Leticia lacks standing because she has an interest adverse to Carlos" and "the probate court's order . . . finding Leticia lacks standing to contest the guardianship proceeding and the appointment of a guardian." *Id.* at *1–2.[22]

The appellate court affirmed the dismissal of Leticia's claims in the Guardianship Proceeding for lack of standing based on her adverse interests, not on the merits of her challenge to the orders voiding the 2011 Will. Because Leticia lacked standing, she was not a party to the Guardianship Proceeding and the orders in that case are not binding on her. *See Swilley v. McCain*, 374 S.W.2d 871, 874 (Tex. 1964) ("[R]es judicata . . . binds only the parties to the first suit and those who claim under them. It may not be invoked by one who is not bound by the judgment in the earlier proceeding.").[23]

---

[21] *See* Brief of Appellees, *Guardianship of Benavides*, No. 04-13-00197-CV, available at https://tinyurl.com/23tde8fd.

[22] Leticia also contends that the probate court's 2013 order declaring the 2011 Will void is itself void for lack of subject-matter jurisdiction "because a court cannot adjudicate the validity of a living person's will." *See* TEX. EST. CODE § 256.002 ("The probate of a will of a living person is void."). In light of our recognition that the 2013 orders are not binding on Leticia, we need not address this alternate contention.

[23] *See also, e.g.*, *State v. Naylor*, 466 S.W.3d 783, 789 (Tex. 2015) (holding State was not bound by divorce decree when it was not a party to

16

Linda also relies on the court of appeals' holding in a different appeal that Carlos lacked capacity to hire the lawyer who drafted the 2011 Will. *See Guardianship of Benavides*, 403 S.W.3d at 377. That appeal arose out of the guardianship court's order finding that the lawyer who appeared on Carlos's behalf to contest Linda's guardianship application lacked authority to represent Carlos because Carlos lacked capacity to contract for legal services in 2011. *Id.* at 372–73. But the court of appeals was careful to explain in that case that the probate court's determination regarding Carlos's capacity was merely "a pre-trial determination regarding an attorney's authority to represent a party" and "d[id] not involve a determination of ultimate issues of fact." *Id.* at 374. The court held only that Leticia was not entitled to a jury trial on that "pre-trial determination" and that "the trial court was well within its discretion in finding that [the attorney] had no authority to represent [Carlos] in the underlying guardianship proceedings." *Id.* at 377. The court expressly did not resolve the ultimate issue of the 2011 Will's validity in that proceeding.

We thus conclude that no court has yet issued a final, non-appealable judgment that is both binding on Leticia and declares that the 2011 Will is invalid. For now, at least, Leticia possesses a legal claim to Carlos's assets under the 2011 Will, which is pending on appeal. Because that claim is automatically destroyed if the marriage ended by

proceedings); *Dougherty v. Humphrey*, 424 S.W.2d 617, 621 (Tex. 1968) (holding judgment in trespass-to-try-title suit was not binding on heirs who lacked standing to assert such claims).

17

decree but not if it ended by death, we conclude that Carlos's death did not moot Leticia's appeal from the decree.

## III.
## Guardian's Authority to Pursue Ward's Divorce

We now turn[24] to Leticia's first merits issue regarding the validity of the divorce decree: whether Texas law permits a court-appointed guardian to pursue a divorce on the ward's behalf. We addressed this issue more than thirty-five years ago, holding that "a guardian ad litem or next friend can exercise the right of a mentally ill person to obtain a divorce." *Wahlenmaier v. Wahlenmaier*, 762 S.W.2d 575, 575 (Tex. 1988) (per curiam). In reaching that conclusion, we expressly disapproved of Texas appellate court decisions holding "that a guardian or next friend may not exercise the right of a mentally ill person to obtain a divorce." *Id.* But as Leticia notes, the ward involved in *Wahlenmaier* had initiated the divorce before she became incompetent, and *Wahlenmaier* was a per curiam decision that "contains no legal analysis and has been cited by only one other Texas court in the past three and a half decades."[25]

Although we have only touched on the issue in *Wahlenmaier*, numerous courts in other jurisdictions have debated the issue for decades. Historically, and even recently, most American courts have

---

[24] Having concluded that the court of appeals erred in holding that Carlos's death mooted Leticia's appeal from the divorce decree, we could simply reverse the court's judgment and remand this cause for that court to address the remaining issues. The trial court, however, has already decided those issues, and the parties have fully briefed the issues and urge us to address them here.

[25] *See Stubbs v. Ortega*, 977 S.W.2d 718, 722 (Tex. App.—Fort Worth 1998, pet. denied) ("*Wahlenmaier* . . . was unequivocal and not limited to a particular set of facts or circumstances.").

18

declined to authorize guardians to initiate a divorce action on their wards' behalf absent clear legislation to the contrary, reasoning that the marriage relationship is "exclusively personal" and "may be dissolved only by the voluntary consent and the comprehending exercise of the will of an injured spouse." *Wood v. Beard*, 107 So. 2d 198, 199 (Fla. Dist. Ct. App. 1958); *see Flory v. Flory*, 527 P.3d 250, 252–54 (Wyo. 2023). These courts have typically expressed the concern that guardians should not have such authority because "a spouse's decision to divorce (or not) is highly personal and imbued with considerations which may not necessarily serve the spouse's best interests or seem reasonable to other people." *Flory*, 527 P.3d at 259–60.[26] As one court summarized the concerns:

> One rationale for the majority rule is that marriage is such a personal commitment that only one of the spouses can make a determination to end the marriage. . . . Courts have

---

[26] *See also In re Marriage of Gannon*, 702 P.2d 465, 467 (Wash. 1985) (en banc) ("The vast majority of courts hold that a guardian has no authority to seek a divorce or dissolution . . . often rely[ing] upon the truism that a decision to dissolve a marriage is so personal that a guardian should not be empowered to make such a choice for the incompetent."); *Murray ex rel. Murray v. Murray*, 426 S.E.2d 781, 784 (S.C. 1993) ("The theory underlying the majority view is that a divorce action is so strictly personal and volitional that it cannot be maintained at the pleasure of a guardian, even if the result is to render the marriage indissoluble on behalf of the incompetent."); *Boyd v. Edwards*, 446 N.E.2d 1151, 1156 (Ohio Ct. App. 1982) (describing marriage as a "deeply personal right," making it "wrong to compel a divorce under no-fault, when neither party desires divorce"); *Wood*, 107 So. 2d at 199–200 ("As a part of the basic concept, there is woven into the marriage fabric, regardless of the marital grievance, the right by the aggrieved spouse to forgive or condone; even the spouse who is guilty of marital wrongdoing has the right of condonation as a defense. For condonation to be effected, since the marriage status is so completely personal, the free exercise of the injured spouse's will and the prerequisite of comprehension are required.").

expressed the concern that the wishes of the disabled spouse not be overridden by the values and judgments of a third party to this intimate relationship. Because there are no offenses which, in and of themselves, effect an end to the marriage, aggrieved spouses may elect to remain in marriages that seem to be against their best interests for personal, religious, moral, or economic reasons. . . . As a practical matter, majority jurisdictions choose an absolute bar as the lesser of two evils, protecting the possibility that the incompetent spouse might elect to remain married if competent, even if it effectively prevents the incompetent spouse from ending the marriage while under the adjudication of incompetency.

*Nelson v. Nelson*, 878 P.2d 335, 338 (N.M. Ct. App. 1994).

Consistent with this reasoning, some courts have held that a guardian may *maintain* a divorce action if the ward *initiated* the action—or at least expressed a clear desire to initiate the action—before he was declared incompetent.[27] This, as we have explained, was the

---

[27] *See, e.g.*, *In re Salesky*, 958 A.2d 948, 955 (N.H. 2008) (permitting action when "the co-guardians were merely maintaining a divorce action that the petitioner had brought before he was adjudged incompetent"); *In re Marriage of Burgess*, 725 N.E.2d 1266, 1270 (Ill. 2000) ("While the risk that a guardian may be acting contrary to a ward's wishes may support the rule that a guardian's power to initiate a dissolution proceeding must be specified by the legislature, this policy consideration does not justify requiring express statutory authority for a guardian to continue a ward's dissolution proceeding."); *Northrop v. Northrop*, No. CN94-9882, 1996 WL 861489, at *9 (Del. Fam. Ct. Dec. 30, 1996) ("[A]n absolute bar to the initiation and maintenance of a divorce action on behalf of an incompetent spouse . . . could lead to inequitable and untenable results in certain cases, especially when the incompetent spouse, when competent, expressed a strong desire to be divorced and when evidence establishes that but for the incompetency, that spouse would have proceeded with a divorce action."); *In re Parmer*, 755 S.W.2d 5, 7 (Mo. Ct. App. 1988) ("[By initiating] the dissolution proceeding before she was declared incapacitated[,] . . . [the ward] demonstrated her desire that the marriage be dissolved.").

situation in *Wahlenmaier*.[28] And others have held that a guardian may initiate and maintain a divorce on the ward's behalf if the guardian establishes that the ward—despite whatever disabilities may justify the guardianship—remains capable of making a reasoned decision to obtain a divorce and has personally expressed that intent.[29]

The more recent and growing trend among American courts, however, is to permit a guardian to initiate and maintain a divorce action on the ward's behalf even in the absence of some indication of the

---

[28] Here, Carlos himself filed for divorce shortly after he and Leticia married, but he did not pursue the suit and the court dismissed it. Because nothing in this record resolves the parties' dispute over whether Carlos changed his mind or was unable to continue due to mental incapacity, we cannot equate these facts to those in *Wahlenmaier*.

[29] *See, e.g.*, *Murray*, 426 S.E.2d at 784 ("[W]e decline to impose an absolute rule denying the right to seek a divorce if the spouse, although mentally incompetent with respect to the management of his estate, is capable of exercising reasonable judgment as to his personal decisions, is able to understand the nature of the action and is able to express unequivocally a desire to dissolve the marriage."); *In re Marriage of Higgason*, 516 P.2d 289, 294 (Cal. 1973) (in bank) ("Such a proceeding may be brought on behalf of a spouse under conservatorship by and through his or her guardian ad litem, provided it is established that the spouse is capable of exercising a judgment, and expressing a wish, that the marriage be dissolved on account of irreconcilable differences and has done so."), *disapproved in part on other grounds by In re Marriage of Dawley*, 551 P.2d 323, 328–29 (Cal. 1976) (in bank); *Nelson*, 878 P.2d at 338 ("[S]tates may bar a divorce action prosecuted entirely by the guardian but allow the action to go forward when the ward is capable of understanding the nature of the action and of expressing a desire to end the marriage and does so."); *Syno v. Syno*, 594 A.2d 307, 311 (Pa. Super. Ct. 1991) ("[A]n incompetent spouse should be permitted to institute a divorce proceeding through a guardian or guardian *ad litem*, *provided* the incompetent is capable of exercising reasonable judgment as to personal decisions, understands the nature of the action and is able to express unequivocally a desire to dissolve the marriage.").

ward's personal intent.[30] These courts have observed that a guardian's suit for divorce, although certainly a very personal decision, is not "qualitatively different from any other deeply personal decision" that guardians routinely make for their wards, "such as the decision to refuse life-support treatment or the decision to undergo involuntary sterilization." *Karbin v. Karbin ex rel. Hibler*, 977 N.E.2d 154, 162 (Ill. 2012) ("[T]here is no reason why the guardian should not be allowed to . . . make all types of uniquely personal decisions that are in the ward's best interests, including the decision to seek a dissolution of marriage.").[31]

More importantly, these courts have explained that denying a guardian the authority to initiate a divorce on the ward's behalf completely deprives the ward of equal access to the courts based solely

---

[30] *See Flory*, 527 P.3d at 253 (explaining that more recent decisions trend toward allowing "a guardian to maintain an action for dissolution of marriage on behalf of an incompetent adult ward" (quoting *Ruvalcaba ex rel. Stubblefield v. Ruvalcaba*, 850 P.2d 674, 681 (Ariz. Ct. App. 1993))); *Nelson*, 878 P.2d at 339 ("Jurisdictions deciding this issue in recent years have increasingly adopted the minority view.").

[31] *See also Gannon*, 702 P.2d at 467 ("[I]n these days of termination of life support, tax consequences of virtually all economic decisions, no-fault dissolutions and the other vagaries of a vastly changing society, we think an absolute rule denying authority is not justified nor in the public interest."); *Nelson*, 878 P.2d at 338–39 ("The rationale for the minority rule is that divorce is only one of the many personal decisions that can and must be made on behalf of adult incompetent wards by their guardians." (citing *Ruvalcaba*, 850 P.2d at 681)); *Ruvalcaba*, 850 P.2d at 681 ("We share the *Gannon* court's view that, in this day and age, when guardians are permitted to refuse medical care on behalf of their incompetent wards—surely a decision that is extremely 'personal' to that individual—prohibiting that same guardian from maintaining an action for dissolution on behalf of the ward cannot be justified.").

on his disability[32] and inequitably grants the competent spouse "absolute, final control over the marriage," *Gannon*, 702 P.2d at 467, even when the incompetent spouse is at great risk of exploitation and abuse.[33] As one court summarized this concern, denying guardians the ability to pursue a divorce on their wards' behalf allows

> the law to unfairly treat incompetent spouses, leaving them at the complete mercy of the competent spouse without consideration of their best interests, . . . even if the ward was in danger as a result of being in the marriage . . . which could result in physical or emotional abuse, financial exploitation, or neglect of the incompetent spouse by the 'competent' partner.

*Karbin*, 977 N.E.2d at 163–64.

Despite these judicial descriptions of the competing policy concerns, however, most courts have acknowledged that state legislatures, and not the courts, possess the power to decide the policy issue and address the guardian's authority by statute. *See Parmer*, 755 S.W.2d at 7 ("The answer to Mr. Parmer's argument lies in the statutes

---

[32] *See, e.g.*, *Flory*, 527 P.3d at 254 ("Another reason provided by minority view courts to allow a guardian or conservator to prosecute a divorce is to protect the ward's right to access and obtain redress from the courts."); *Luster v. Luster*, 17 A.3d 1068, 1074 n.9 (Conn. App. Ct. 2011) ("The effect of the plaintiff's actions in the trial court has been to deny the defendant equal access to the court and to a hearing on relief that he, but not the plaintiff, seeks, solely on the basis of his incompetence.").

[33] *See Salesky*, 958 A.2d at 955 (finding these "countervailing policy concerns" to be "particularly evident" when "the probate court found that the respondent had withdrawn substantial funds from the petitioner's bank accounts while acting under a power of attorney"); *Ruvalcaba*, 850 P.2d at 681 ("Such a situation not only is inequitable, but also threatens to leave an incompetent spouse without adequate legal recourse against potential physical, emotional or financial abuse by the competent spouse.").

themselves."). Thus, even the "majority rule" has long provided that, "*absent statutory authorization*, a guardian cannot maintain an action on behalf of a mentally incompetent for the dissolution of the incompetent's marriage." *Murray*, 426 S.E.2d at 783 (emphasis added) (citing cases).[34]

The courts have not been unanimous, however, in the way they construe such statutes. Some courts, motivated by their concerns about the "purely personal" nature of marriage and divorce, have construed the relevant statutes strictly, holding that a statute does not grant a guardian authority to initiate a divorce simply by granting the general authority to file suits on the ward's behalf. *See Flory*, 527 P.3d at 252 ("Under the traditional rule, courts do not read statutes granting guardians general powers to act on behalf of the ward as authorizing divorce actions because the decision to divorce is 'too personal and volitional' to be pursued at the 'pleasure or discretion' of a guardian."

---

[34] *See also Flory*, 527 P.3d at 252 ("The traditional majority rule throughout the United States holds a guardian, conservator, or other legal representative does not have the power to file or maintain an action for the ward's divorce *unless that power is specifically granted by statute*." (emphasis added)); *Campbell v. Campbell*, 5 So. 2d 401, 401 (Ala. 1941) ("The rule sustained by the weight of authority is, *in the absence of statute so authorizing*, an insane person cannot bring an action for divorce, nor can his guardian, committee or next friend bring such action in his name and behalf." (emphasis added)); *Nelson*, 878 P.2d at 337 ("Most states that have addressed the issue hold that, *absent specific authority granted by statute*, an incompetent or insane spouse may not bring or continue an action for divorce, nor may such an action be brought or maintained by a guardian on behalf of a ward." (emphasis added)); *Wood*, 107 So. 2d at 199 ("The rule is well established in the United States by the overwhelming weight of authority that a guardian of a mentally incompetent person cannot bring and maintain an action for divorce on behalf of his insane ward *unless there has been legislative enactment to authorize such procedure*." (emphasis added)).

(quoting *Brooks by Elderserve, Inc. v. Hagerty*, 614 S.W.3d 903, 910, 914 (Ky. 2021))). Under this approach, guardians lack authority to sue for divorce unless a statute expressly and specifically grants that power. *See Murray*, 426 S.E.2d at 783 ("Although there are statutes in practically every jurisdiction which give a guardian the general authority to maintain actions on behalf of an incompetent, it is generally held that these statutes do not apply to divorce actions unless the statute expressly so states.").

Most courts have disagreed with this construction, however, and have held that a statutory grant of broad authority[35] to "file suit" or "bring an action" on the ward's behalf includes the authority to file suit for divorce, even if the statute does not expressly mention divorce.[36] The result may be different, of course, if the statute contains other language that limits the broad authority as applied to divorce actions or imposes

---

[35] Of course, a statute that does not include a broad grant and instead grants only the authority to take specific actions without including divorce actions does not authorize the guardian to initiate a divorce action. *See Flory*, 537 P.2d at 256 ("Unlike guardianship statutes in some states that have recognized an implied right for guardians to sue for the ward's divorce, our statutes do not contain a general grant of authority to a guardian to pursue *any* legal action for the ward or to exercise the same rights parents have for their children."), 257 ("The legislature's choice to specifically authorize a guardian to file certain types of suits while omitting any right to bring a divorce action indicates the legislature did not intend to give a guardian power to sue for his ward's divorce.").

[36] *See Salesky*, 958 A.2d at 954 ("Under the catchall provisions, a probate court may expressly grant this authority to a guardian when it deems such action 'desirable for the best interests of the ward.'"); *Nelson*, 878 P.2d at 338 ("[M]ost minority-rule courts construe existing statutes authorizing the guardian to pursue and defend civil claims in the interests of their ward to include authority to bring an action for divorce.").

particular requirements for divorce actions.[37] But in the absence of such limiting language, most courts have construed statutes that broadly authorize guardians to "file suit" or "bring a civil action" to include a divorce action because, after all, "an action for dissolution of marriage is a civil action." *Luster*, 17 A.3d at 1080. As one court explained, such statutes grant "exceedingly broad powers" that are effectively the "same rights, powers, and duties respecting the ward as a parent has respecting a child," which includes "the authority to interfere in the most intimately personal concerns of an individual's life." *Nelson*, 878 P.2d 339–40.[38]

We acknowledge the policy concerns expressed by all of these courts. On the one hand, we too have recognized that marriage is a deeply "personal affiliation," *Osterberg v. Peca*, 12 S.W.3d 31, 46 (Tex. 2000), that a divorce action is "purely personal to the parties," *Baker*, 687 S.W.3d at 289 & n.3, and that all persons enjoy "individual autonomy in making decisions and conduct relating to marriage . . . [and] family relationships," *City of Sherman v. Henry*, 928 S.W.2d 464, 467 (Tex. 1996) (citing *Whalen v. Roe*, 429 U.S. 589, 600 & n.26 (1977)). On the other hand, we have also recognized that a person

---

[37] *See Ruvalcaba*, 850 P.2d at 678–79 (holding that a general grant is sufficient in the absence of statutory language excluding divorce actions from the grant); *In re Marriage of Ballard ex rel. Storkel*, 762 P.2d 1051, 1052 (Or. Ct. App. 1988) (holding statute authorizing guardian to pursue suits for ward without specifying any specific procedure required for divorce actions authorized guardian to pursue suit ward had initially filed for divorce).

[38] *See Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 705 (Tex. 2014) (noting that Texas's technical statutory requirements for guardianships "bring guardians in line with the powers and duties that parents possess").

placed under guardianship does not lose his constitutional or legal rights,[39] which expressly include the right of access to the courts,[40] and that guardianships can only achieve their purpose when the guardian possesses the powers necessary to "promote and protect the well-being of the incapacitated person." TEX. EST. CODE § 1001.001(a). After all, as the United States Supreme Court has explained, "The whole theory of guardianships is to protect the ward during his period of incapacity to protect himself." *Oyama v. California*, 332 U.S. 633, 643–44 (1948).

These competing concerns require, as one court described it, a policy choice between "the lesser of two evils":[41] Should the law permit a guardian to pursue a divorce the ward might not have chosen to pursue, or should it permit a competent spouse to have complete and total control over the marriage, even when the ward is at risk of neglect, exploitation, or abuse? *See Karbin*, 977 N.E.2d at 163–64; *Gannon*, 702 P.2d at 467. This is the very type of policy choice on which we consistently defer to the Legislature, as the duly elected policy-making branch of government.[42]

---

[39] *See Barclay v. Campbell*, 704 S.W.2d 8, 11 (Tex. 1986) ("A person suffering from a mental illness is guaranteed all the rights, benefits, responsibilities and privileges afforded by the constitutions and laws of the United States and Texas.").

[40] *See* TEX. CONST. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.").

[41] *Nelson*, 878 P.2d at 338.

[42] *See, e.g.*, *Campbellton Rd., Ltd. v. City of San Antonio*, 688 S.W.3d 105, 114 (Tex. 2024) (explaining that we defer to the Legislature's policy choices on whether and when to waive sovereign immunity); *Morath v. Tex.*

Unfortunately, the Texas Legislature has not made that choice clear in the Texas Estates Code. The Code contains two separate provisions that address a guardian's power to file suit on the ward's behalf. The first broadly expresses that "the guardian of the estate of a ward is entitled to . . . bring and defend suits by or against the ward." TEX. EST. CODE § 1151.101(a)(4). The second is more specific, providing that "[t]he guardian of the estate of a ward appointed in this state may commence a suit for: (1) the recovery of personal property, debts, or damages; or (2) title to or possession of land, any right attached to or arising from that land, or injury or damage done." *Id.* § 1151.104(a).

Linda, of course, relies on Section 1151.101(a), noting that it broadly authorizes guardians to "bring . . . suits by . . . the ward" without any limitation. And Leticia, of course, relies on Section 1151.104(a), noting that it only authorizes guardians to bring two specific types of suits, neither of which includes a suit for divorce. Leticia also notes that Section 1151.101(a)'s grant of broad authority is expressly made "[s]ubject to Subsection (b)," which provides that a guardian's "management of a ward's estate . . . is governed by the provisions of this title." *Id.* § 1151.104(b). Because the title's provisions include Section 1151.104(a), she reasons that the broad grant of authority to bring suit is limited to the two types of suits specified.

*Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 846 (Tex. 2016) (deferring to Legislature's policy choices on how to fund public schools); *Strickland v. Medlen*, 397 S.W.3d 184, 196 (Tex. 2013) (deferring to Legislature to make policy choices on how to compensate for loss of a family pet); *Smith v. Merritt*, 940 S.W.2d 602, 603–04 (Tex. 1997) (deferring to Legislature's policy choice to prohibit liability of a social host).

28

In addition, we note that the Family Code acknowledges that guardians possess the authority to file suit for *annulment* of a marriage on a ward's behalf. *See* TEX. FAM. CODE § 6.108(a) (authorizing courts to grant an annulment "on the suit of the party or the party's guardian or next friend, if the court finds it to be in the party's best interest to be represented by a guardian or next friend" and makes additional findings). On the one hand, if the Estates Code only authorized guardians to commence the two types of suits described in Section 1151.104(a), a guardian could never file a suit for annulment as the Family Code contemplates. On the other hand, it may be true that if the Legislature wanted to acknowledge that guardians possess the authority to file suit for *divorce* on a ward's behalf, it would have done so.

In light of this lack of clarity, the Legislature may wish to consider amending the Estates Code or the Family Code to plainly express its policy choice on this issue. In the meantime, however, we need not definitively construe the current statutes to resolve this case. *If* the Estates Code empowers courts to authorize guardians to initiate a suit for divorce on a ward's behalf, it also imposes two limitations on that authority. First, the guardian must obtain a court order that expressly authorizes the guardian to pursue the divorce on the ward's behalf. Although Section 1151.102, which lists actions a guardian may take only "if authorized by court order," does not include filing divorce suits in its list, *see* TEX. EST. CODE § 1151.102, we find this requirement in the language of Sections 1151.001 and 1151.351.

29

Section 1151.001 provides that an "incapacitated person for whom a guardian is appointed retains all legal and civil rights and powers *except those designated by court order* as legal disabilities by virtue of having been specifically granted to the guardian." *Id.* § 1151.001 (emphasis added). Similarly, Section 1151.351(a) provides that a "ward has all the rights, benefits, responsibilities, and privileges granted by the constitution and laws of this state and the United States, *except where specifically limited by a court-ordered guardianship or where otherwise lawfully restricted.*" *Id.* § 1151.351(a) (emphasis added). And Section 1151.351(b) provides, "[u]nless limited by a court or otherwise restricted by law, a ward is authorized . . . to vote in a public election, marry, and retain a license to operate a motor vehicle, unless restricted by the court." *Id.* § 1151.351(b). Although these sections do not expressly mention the right to sue for divorce, a divorce (as explained above) is a matter that is "purely personal to the parties," *Baker*, 687 S.W.3d at 289 & n.3; *see Whatley*, 649 S.W.2d at 299, and a matter of "individual autonomy," *City of Sherman*, 928 S.W.2d at 467. Because the Family Code expressly grants the right to divorce based on specified grounds, that right is one of the "legal rights" a ward himself retains unless it is specifically granted to the guardian by court order.[43] We thus conclude that, to whatever extent the Estates Code may permit a guardian to initiate a suit for divorce on the ward's

---

[43] *See, e.g.*, *Weatherly v. Byrd*, 566 S.W.2d 292, 293 (Tex. 1978) ("[W]e hold that the right to revoke a revocable trust . . . is a purely personal right of the settlor and does not vest in the guardian[;] . . . the guardian must apply to a court of competent jurisdiction for authorization to revoke the trust.").

30

behalf, it requires the guardianship court to expressly grant the guardian that authority.

Second, *if* the Estates Code authorizes a guardian to obtain a divorce on the ward's behalf, the filing of the divorce action and the later granting of the divorce must be in the ward's best interest and promote and protect the ward's well-being. We find this requirement in Section 1001.001 of the Estates Code, which provides that a court may grant a guardian authority "only as necessary to promote and protect the well-being of the incapacitated person." TEX. EST. CODE § 1001.001(a). Indeed, a court may not appoint a guardian at all unless it first finds by clear and convincing evidence that doing so "is in the proposed ward's best interests." *Id.* §§ 1101.101(a)(1)(B), 1104.101. Under the Estates Code, the ward's best interests and well-being must be the key consideration for everything a guardian does on the ward's behalf.[44] To the extent a court can authorize a guardian to pursue a divorce on the ward's behalf, the guardianship court must expressly find that granting such authority is in the ward's best interest. But because the question of whether a divorce sought by a guardian is ultimately in the ward's best interest can only be answered based on the evidence submitted in the divorce proceeding, the court that grants the divorce must also make the ultimate finding that the divorce sought by the guardian is in the

---

[44] *See, e.g.*, TEX. EST. CODE §§ 1023.009 (best interests required to transfer a guardianship or appoint a new guardian), 1104.001(a) (best interests required to appoint separate persons as guardians of a ward's person and estate), 1151.055(g)(1)(c) (best interests required to authorize certain relatives to have access to the ward), .056(g)(4) (best interests required to authorize a guardian to withhold notice of ward from a relative), 1203.153(a) (best interests required to appoint a successor guardian).

ward's best interest and will promote and protect the ward's well-being.[45]

The parties here disputed both whether the guardianship court expressly granted Linda the authority to pursue this divorce on Carlos's behalf[46] and whether the divorce would promote Carlos's best interests and well-being. But regardless of those disputes, neither the guardianship court nor the divorce court ever expressly found that pursuing or granting the divorce would be in Carlos's best interest and promote his well-being. We must therefore vacate the trial court's divorce decree.

It may be true that a divorce was in Carlos's best interest at the time the trial court granted it. Linda did in fact present the trial court with some evidence of marital friction, or worse, during Carlos's final years with Leticia. Were Carlos still living, we could definitively decide whether the Estates Code permits guardians to pursue a divorce for the ward and, if so, could remand this cause to the divorce court so that Linda could obtain the finding that a grant of divorce is in Carlos's best

---

[45] This requirement is consistent with the Legislature's requirement that a court that grants an annulment based on a suit filed by a guardian must find that the guardian's representation of the ward for that purpose is in the ward's best interest. *See* TEX. FAM. CODE § 6.108(a).

[46] The guardianship court's March 6, 2013 order authorized *Mathis* to "file, prosecute or defend any litigation, including divorce proceedings on [Carlos]'s behalf," and its supplemental order a month later authorized *Linda* "to join with the Permanent Guardian of the Estate [Mathis] to prosecute, defend and otherwise participate in a divorce action on behalf of the Ward." Leticia argues that the supplemental order authorized Linda to participate with Mathis in the Second Divorce Proceeding but did not authorize Linda to independently file the Third Divorce Proceeding after Mathis resigned.

interest and would promote and protect his well-being. But because he has passed, Linda can no longer demonstrate these requirements. We therefore decline to definitively decide the authority issue and must dismiss the suit. We do so not because the way the marriage ended will not affect Leticia's interests under *Dunn* but because the courts can no longer make the findings necessary to authorize the divorce. [47]

---

[47] In her third issue, Leticia also challenges the divorce decree's validity by arguing that the Texas Family Code does not permit a divorce on the ground that the parties lived apart for at least three years when the "living apart" was not "voluntary" by at least one spouse. The relevant Family Code provision states only that "[t]he court may grant a divorce in favor of either spouse if the spouses have lived apart without cohabitation for at least three years." TEX. FAM. CODE § 6.006. We held long ago that this provision does not permit a divorce when the spouses voluntarily and mutually separate for a period *less than* the statute requires, but we did not address whether the ground applies if the separation exceeds the length required but is *not* voluntary or mutual. *Schulz v. L.E. Whitham & Co.*, 27 S.W.2d 1093, 1097 (Tex. 1930).

Most courts in other jurisdictions have construed similar statutes to require that at least one spouse must intend to dissolve the marriage and voluntarily cause the separation. *See Sinha v. Sinha*, 526 A.2d 765, 767 (Pa. 1987) (holding one spouse must intend to dissolve the marital union before the time period commences and clearly communicate that intent to the other); *Hooker v. Hooker*, 211 S.E.2d 34, 36 (Va. 1975) (per curiam) ("[T]he separation [must] be coupled with an intention on the part of at least one of the parties to live separate and apart permanently, and . . . this intention must be shown to have been present at the beginning of the uninterrupted two year period of living separate and [a]part without any cohabitation."); *Caye v. Caye*, 211 P.2d 252, 254 (Nev. 1949) ("The status exists whenever the marital association is severed or when married persons intend to live apart because of their mutual purpose to do so, or because one of the parties, with or without the acquiescence of the other, intends to disrupt the marital relationship."); *Otis v. Bahan*, 26 So. 2d 146, 148 (La. 1946) ("To constitute the voluntary separation required by the statute, it must appear that the separation upon the part of at least one of the parties was voluntary in its inception and was continuous throughout the statutory period."); *Byers v. Byers*, 22 S.E.2d 902, 906 (N.C. 1942) ("There must be at least an intention on the part of one of the parties to cease cohabitation,

# IV.
## Conclusion

We conclude that Carlos's death during the pendency of Leticia's appeal from the divorce decree did not moot the appeal. We also conclude that, to whatever extent the Estates Code may permit a court to authorize a guardian to pursue a divorce on the ward's behalf, it at least requires finding that pursuing and granting the divorce would be in the ward's best interests and protect and promote his well-being. Because Linda did not obtain such findings from the guardianship court or the divorce court and cannot obtain them now, we reverse the court of

---

and this must be shown to have existed at the time alleged as the beginning of the separation period; it must appear that the separation is with that definite purpose on the part of at least one of the parties."); *Dailey v. Dailey*, 463 N.E.2d 427, 429 (Ohio Ct. App. 1983) ("It is generally accepted that before separation can be used as a ground for divorce, the separation must be voluntary.") (citing authorities).

But the Texas appellate courts that have addressed the issue have not construed the living-apart provision to include a voluntariness requirement, or any other requirement or limitation. *See Fields v. Fields*, 399 S.W.2d 958, 958–59 (Tex. App.—Waco 1966, no writ) (holding that the living-apart provision "require[s] the spouse to live apart without cohabitation for 7 years; and the cause of the separation, and subsequent conduct, of the one seeking divorce are not proper subjects of inquiry"); *McGinley v. McGinley*, 295 S.W.2d 913, 916 (Tex. App.—Galveston 1956, no writ) ("Where mere living apart for seven years is the basis for divorce, fault or responsibility for the separation is not a material fact."); *Robertson v. Robertson*, 217 S.W.2d 132, 135 (Tex. App.—Fort Worth 1949, no writ) ("It will be noted that the Act nowhere includes the words 'voluntary' or 'mutual,' but clearly indicates that independent of any other provisions of the statutes there is ground for divorce of the parties if they have lived apart without cohabitation for as long as ten years.").

Because we conclude that the divorce decree is invalid on other grounds, we need not reach this issue to resolve this case. The Legislature may want to consider amending Section 6.006 to clarify its policy choice on this issue as well.

34

appeals' judgment finding this appeal moot, vacate the trial court's divorce decree, and dismiss the suit.

_____

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** April 25, 2025